Ali Saleh Kahlah AL–MARRI, and Mark A. BERMAN, as next friend, Petitioners,

v.

Commander S.L. WRIGHT, USN Commander, Consolidated Naval Brig, Respondent.

Civil Action No. 2:04–2257–HFF.

United States District Court, D. South Carolina, Charleston Division.

Aug. 8, 2006.

---

Andrew John Savage, III, Savage and Savage, Charleston, SC, Jonathan L. Hafetz, New York, NY, Lawrence Steven Lustberg, Mark A. Berman, Gibbons Del Deo Dolan Griffinger and Vecchione, Newark, NJ, for Petitioners.

Mark A. Berman, Newark, NJ, pro se.

J. Strom Thurmond, Jr, Smith Massey Brodie and Thurmond, Aiken, SC, Kevin F. McDonald, U.S. Attorneys Office, Columbia, SC, Miller W. Shealy, Jr, U.S. Attorneys Office, Charleston, SC, for Respondent.

MEMORANDUM OPINION
AND ORDER

FLOYD, District Judge.

## I. INTRODUCTION

This is a petition for writ of habeas corpus, filed pursuant to 28 U.S.C. § 2241. The Court has jurisdiction over the subject matter under 28 U.S.C. § 1331. The mat-

ter is before the Court for review of the Report and Recommendation (Report) of the United States Magistrate Judge recommending that the Court dismiss the petition. The Report is made in accordance with 28 U.S.C. § 636 and Local Civil Rule 73.02 for the District of South Carolina.

## II. FACTUAL AND PROCEDURAL HISTORY

In its Memorandum Opinion and Order of July 8, 2005, the Court recited the facts relevant to this petition:

[Petitioner Ali Saleh Kahlah] [a]l-Marri[1] is a Qatari national who legally entered the United States on September 10, 2001, with his wife and children. He had previously obtained a bachelor's degree from Bradley University in Peoria, Illinois, in the early 1990s, and was returning to the United States to obtain a master's degree from Bradley.

On December 12, 2001, al-Marri was arrested by FBI agents in Peoria at the direction of the U.S. Attorney's Office for the Southern District of New York as a material witness in the investigation of the September 11, 2001, terrorist attacks. He was then transferred to New York City.

Al–Marri was formally arrested on a criminal complaint charging him with credit card fraud on January 28, 2002. On February 6, 2002, he was indicted and charged with possession of 15 or more unauthorized or counterfeit access devices with intent to defraud in the United States District Court for the Southern District of New York. He pled not guilty, and the case followed the normal course of litigation. On January 22, 2003, al-Marri was charged in a second indictment with two counts of making a false statement to the FBI, three

counts of making a false statement in a bank application, and one count of using a means of identification of another person for purposes of influencing the action of a federally insured financial institution. He also entered a plea of not guilty to the second indictment and succeeded in having the two indictments consolidated.

Al–Marri initially waived any objection to venue in the Southern District of New York, but later withdrew his waiver after obtaining new counsel. He then moved to dismiss the indictments on grounds of improper venue. On May 12, 2003, al-Marri's motion was granted and the indictments were dismissed for improper venue. However, a new criminal complaint had been filed under seal in [the Central District of Illinois] on May 1, 2003, and al-Marri was arraigned on that complaint on May 13, 2003. He was then transferred back to Peoria, where a grand jury indicted him on the same counts that had been charged in the two indictments in the Southern District of New York. Al–Marri was arraigned and a pretrial conference was set for July 2, 2003, with a jury trial to begin on July 21, 2003.

On June 23, 2003, President Bush designated al-Marri as an enemy combatant and directed that he be transferred to the control of the Defense Department for detention. That same morning, the U.S. Attorney's Office moved to dismiss the indictment with prejudice, and the motion was granted. Al–Marri's counsel then requested that the [c]ourt stay the case to prevent any attempt to transfer him from the jurisdiction until he could file a habeas petition. However, the [c]ourt determined that as the case had

---

**1.** As the Court has previously noted, there are two Petitioners in this case, one of whom is acting as Ali Saleh Kahlah al-Marri's next

friend. As used here, "Petitioner" refers to al-Marri.

been dismissed with prejudice, it lacked jurisdiction to issue any type of a stay. The [c]ourt did obtain the U.S. Attorney's agreement to inform counsel of the location to which al-Marri was to be moved, and counsel has been so advised. The U.S. Attorney also agreed to provide both the [c]ourt and al-Marri's counsel with advance notice if al-Marri was going to be moved to any location outside of the United States so that counsel could seek an emergency injunction in the appropriate court. Al–Marri was then immediately transferred into military custody and transported to the Naval Consolidated Brig in Charleston, South Carolina, where he continues to be held.

On July 8, 2003, al-Marri's counsel filed a § 2241[p]etition on his behalf, as it is undisputed that al-Marri is unavailable to sign it for himself. In response, the Government moved to either dismiss or transfer the [p]etition to the District of South Carolina, raising essentially three arguments: (1) the [p]etition has not been properly brought on al-Marri's behalf; (2) no proper respondent with custody over al-Marri is present within this Court's territorial jurisdiction; and (3) venue over the action appropriately lies in South Carolina, where he is detained.

*Al–Marri v. Hanft,* 378 F.Supp.2d 673, 674–75 (D.S.C.2005) (order denying summary judgment) (quoting *Al–Marri v. Bush,* 274 F.Supp.2d 1003, 1004–04 (C.D.Ill.2003)).

**2.** Petitioner's second and fifth claims, not cognizable in this habeas action, are the subject of a second civil action currently pending before the Court, *Al–Marri v. Rumsfeld,* C.A. No. 2:05–2259–HFF–RSC.

**3.** Subsequent to the issuance of the Report, the Supreme Court decided *Hamdan v. Rumsfeld,* —— U.S. ——, 126 S.Ct. 2749, 165

The United States District Court for the Central District of Illinois granted the Government's motion to dismiss on the ground that the petition had been filed in an improper venue. *Al–Marri,* 274 F.Supp.2d at 1010. The Court of Appeals for the Seventh Circuit affirmed, *Al–Marri v. Rumsfeld,* 360 F.3d 707 (7th Cir.2004), and the Supreme Court denied certiorari, *Al–Marri v. Rumsfeld,* 543 U.S. 809, 125 S.Ct. 34, 160 L.Ed.2d 11 (2004).

On July 8, 2004, Petitioner filed the present petition for writ of habeas corpus, making five claims: (1) unlawful detention, (2) right to counsel, (3) right to be charged, (4) denial of due process, and (5) unlawful interrogation.[2] One year later, on July 8, 2005, the Court denied Petitioner's third ground for relief, holding that the President of the United States possesses the legal authority to order detention as an enemy combatant of a noncitizen captured in the United States. *Al–Marri,* 378 F.Supp.2d at 682. The Court then recommitted the petition to United States Magistrate Judge Robert S. Carr for an examination of the factual allegations supporting Respondent's detention of Petitioner as an enemy combatant. Subsequently, Magistrate Judge Carr directed the parties to brief the Court on the burdens of production and persuasion applicable to the factual inquiry regarding Petitioner's detention. After reviewing these briefs and giving the parties an opportunity to respond and to be heard, the Magistrate Judge issued the Report which the Court now reviews.[3]

L.Ed.2d 723 (2006). After reviewing the parties' supplemental briefs discussing the possible relevance of *Hamdan* here, the Court concludes that *Hamdan* has no bearing on the instant petition. *See id.* at 2798 (expressly noting that *Hamdan* did not "address[ ] the Government's power to detain [Hamdan] for the duration of active hostilities[.]").

## III. STANDARD OF REVIEW

■ The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight. The responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). The Court is charged with making a *de novo* review of those portions of the Report to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

## IV. DISCUSSION

### A. *Burdens of Production and Persuasion*

As the Magistrate Judge notes, there is no binding standard for reviewing the factual basis supporting the detention of an alleged enemy combatant. (Report 3.) What little guidance is available comes from the Supreme Court's plurality opinion in *Hamdi v. Rumsfeld*, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004). In *Hamdi*, a plurality of the Court held that the President has the authority to detain a United States citizen captured while taking up arms against the United States in support of the Taliban or Al-Qaeda. The plurality also held, however, that "a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Id.* at 533, 124 S.Ct. 2633. In fleshing out the details of what has come to be called the "due process hearing," the plurality added that:

> enemy combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict. Hearsay, for example, may need to be accepted as the most reliable available evidence from the Government in such a proceeding. Likewise, the Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided. Thus, once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria.

*Id.* at 534, 124 S.Ct. 2633. Describing this process as "both prudent and incremental," the plurality noted that the "full protections that accompany challenges to detentions in other settings may prove unworkable and inappropriate in the enemy-combatant setting." *Id.* at 535, 124 S.Ct. 2633.

Petitioner now seeks to escape the framework outlined by the *Hamdi* Court and asserts that Respondent should be required to bear both the burdens of production and persuasion under a standard more closely approximating that used in a criminal trial. (Pet's.Obj.18–27.) Petitioner contends that the Constitution does not permit any presumption in favor of the Government, *id.* at 17, that any evidence produced by the Government must be admissible under the Federal Rules of Evidence, *id.* at 27, and that he is entitled to discovery, *id.* at 33. In short, Petitioner advocates a "full-blown adversary process." *Id.* at 16.

■ Petitioner's principal contention is that *Hamdi* does not apply here because the "constitutional balance" it struck is limited to cases where the alleged enemy combatant is captured on a foreign battlefield. The Court finds this argument unconvincing.

As an initial matter, while the Supreme Court necessarily analyzed the President's authority to detain Hamdi based on the location of his capture, the Court's discussion of the process which he was to be afforded is not tethered to the facts surrounding his apprehension and detention. Instead, the plurality repeatedly emphasized that the due process requirements it outlined apply to "enemy combatants." *Hamdi*, 542 U.S. at 524, 124 S.Ct. 2633 ("Even in cases in which the detention of enemy combatants is legally authorized, there remains the question of what process is constitutionally due to a citizen who disputes his enemy-combatant status."); *id.* at 532, 124 S.Ct. 2633 (speaking of the "proper constitutional balance when a United States citizen is detained as an enemy combatant"); *id.* at 533, 124 S.Ct. 2633 ("We therefore hold that a citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice … and a fair opportunity to rebut the Government's factual assertions[.]"); *id.* ("[E]nemy combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict."); *id.* at 534, 124 S.Ct. 2633 ("[O]nce the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria …"); *id.* at 535, 124 S.Ct. 2633 ("[W]hile the full protections that accompany challenges to detentions in other settings may prove unworkable and inappropriate in the enemy-combatant setting….").[4] In light of these statements, it seems clear that the Supreme Court intended the due process structure it announced in *Hamdi* to apply to any challenge to detention mounted by an alleged enemy combatant.

Petitioner's attempt to limit *Hamdi's* scope likewise finds little support in the few subsequent cases which have analyzed challenges to detention. The United States District Court for the District of Columbia, for example, observed that *Hamdi* "considered the process that is owed under the Constitution for United States citizens detained as enemy combatants." *Khalid v. Bush*, 355 F.Supp.2d 311, 323 n. 16 (D.D.C.2005). Importantly, the court made this statement while reviewing the claims of alleged enemy combatants defined as:

> individual[s] who [were] part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

*Id.* at 315 n. 2. This definition makes no reference to the location of any hostile act or the place of capture. In noting that any due process rights possessed by the *Khalid* detainees afford "much of the same process" available to Hamdi, the court implicitly recognized the broad applicability of the due process standards set out in *Hamdi*.

Similarly, in *Padilla v. Hanft*, the Fourth Circuit viewed *Hamdi* as addressing the authority of the Executive "to detain citizens who qualify as 'enemy combatants.' " 423 F.3d 386, 391 (4th Cir.2005) (quoting *Hamdi*, 542 U.S. at 516, 124 S.Ct. 2633). While it is true that *Hamdi* and *Padilla* defined "enemy combatants" as "individual[s] who … [were] part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict

---

4. Although the plurality spoke in terms of the process available to a citizen who challenges his detention, Petitioner's status as a non-citizen would not seem to warrant any expansion of the process to which a citizen detained as an enemy combatant is entitled.

against the United States there," *Padilla*, 423 F.3d at 391 (citing *Hamdi*, 542 U.S. at 516, 124 S.Ct. 2633) (internal punctuation omitted) (alteration in original), this definition was expressly used only for "purposes of this case," *Hamdi*, 542 U.S. at 516, 124 S.Ct. 2633; *see also Padilla*, 423 F.3d at 391. *Hamdi* itself recognized that "there is some debate as to the proper scope" of the term "enemy combatant." *Hamdi*, 542 U.S. at 516, 124 S.Ct. 2633. The Court further observed that "[t]he legal category of enemy combatant has not been elaborated in great detail. The permissible bounds of the category will be defined by the lower courts as subsequent cases are presented to them." *Id.* at 522, 124 S.Ct. 2633. It is clear, then, that the term "enemy combatant" is not limited to the definition used in *Hamdi*. This Court, in fact, recognized as much when it denied Petitioner's motion for summary judgment. *Al–Marri*, 378 F.Supp.2d at 676–77 (holding that Petitioner's status as an alien, rather than his place of capture, justifies his detention by the President). As *Hamdi* has been interpreted as supporting the authority of the President to designate Padilla, 423 F.2d at 391, and al-Marri, 378 F.Supp.2d at 676–77, as enemy combatants and to order their detention, it makes little sense to cast aside the framework it announced for analyzing the factual evidence supporting that detention. The Court concludes, then, that the due process requirements outlined in *Hamdi* apply here.

■ Having determined that *Hamdi* applies, the question becomes what burdens it places on the Government and on an alleged enemy combatant during the initial phase of an enemy combatant proceeding. While the plurality opinion does not indicate precisely how the burdens of production and persuasion are to be allocated, it does offer much guidance. First, as already noted, it indicates that the Constitution permits "a presumption in favor of the Government's evidence." *Hamdi*, 542 U.S. at 534, 124 S.Ct. 2633. Second, once the Government puts forth "credible evidence" that the petitioner is an enemy combatant, the burden shifts to the petitioner to rebut that showing with "more persuasive evidence." *Id.*

### B. Factual Evidence

#### 1. Government's Burden

Using the framework announced in *Hamdi*, the Court begins its inquiry by examining the evidence put forth by the Government in support of Petitioner's detention. Here, Respondent bases Petitioner's designation as an enemy combatant and his continued detention solely on the "Declaration of Mr. Jeffrey N. Rapp, Director, Joint Intelligence Task Force for Combating Terrorism" ("Rapp Declaration" or "the Declaration"), which consists of a summary of the intelligence gathered on Petitioner's activities in the United States. Before considering the import of the Rapp Declaration, the Court turns to Petitioner's objection to the Magistrate Judge's conclusion that the Declaration can be considered by the Court in support of Respondent's argument that Petitioner is an enemy combatant.

#### a. Petitioner's Objections

Petitioner's principal objection to the Court's consideration of the Rapp Declaration centers on the hearsay status of the Declaration. After asserting that hearsay is not admissible here, Petitioner argues, "The government's declarant, Jeffrey N. Rapp, whose hearsay statement provides the sole factual basis for Petitioner's potentially lifelong imprisonment, has no personal knowledge of any asserted facts." (Pet's.Obj.28.) Thus, Petitioner posits that the admission of the Rapp Declaration would run afoul of the prohibition of the admission of hearsay found in the Federal

Rules of Evidence. In this argument, Petitioner is joined by amici curiae. In support of this position, Petitioner and amici contend that *Hamdi* cannot be read to permit a court to receive a hearsay affidavit such as the Rapp Declaration into evidence.[5]

■ In making this argument, Petitioner and amici misread *Hamdi* and misunderstand the nature of the current proceedings. As already observed, *Hamdi* indicated that enemy combatant proceedings should be "both prudent and incremental." 542 U.S. at 539, 124 S.Ct. 2633. The Court further indicated that the first increment consists of a simple examination of the available evidence and an opportunity for rebuttal by the detainee. *Id.* at 538, 124 S.Ct. 2633. At this stage, a court can quickly separate out "the errant tourist, embedded journalist, or local aid worker," *id.* at 534, 124 S.Ct. 2633, after a quick comparison of the evidence presented by the Government and the rebuttal offered by the detainee. A process of this sort, then, prevents an "erroneous deprivation of a detainee's liberty interest" while eliminating procedures which unduly burden the Government. *Id.* Incumbent in this process is the detainee's burden of presenting rebuttal evidence sufficient to overcome the Government's factual basis

for detaining the alleged combatant. Therefore, the question at this stage is whether the factual notice provided by the Government can consist of hearsay or whether it must meet a more stringent evidentiary standard.

On this point, *Hamdi* is unequivocal: hearsay may be used to satisfy the Government's burden of providing an alleged enemy combatant with notice of the factual allegations against him. In *Hamdi*, the Supreme Court repeatedly indicated that hearsay may be considered at the initial phase of enemy combatant proceedings. The Court, for example, expressly rejected the district court's view which "disapproved of the hearsay nature of the Mobbs Declaration." 542 U.S. at 528, 532, 124 S.Ct. 2633. The Court further held that "[h]earsay ... may need to be accepted as the most reliable available evidence from the Government in such a proceeding." *Id.* at 533–34, 124 S.Ct. 2633. This hearsay could exist of, among other things, a summary of official records created by "a knowledgeable affiant." *Id.* at 534, 124 S.Ct. 2633. Finally, the Court gave specific approval to the admission of these affidavits, holding that "a habeas court in a case such as this may accept affidavit evidence like that contained in the Mobbs Declaration, so long as it also permits the

**5.** Despite this argument, amici admit, "To be sure, the *Hamdi* plurality indicated that the hearsay affidavit in that case, if admitted on remand, would not offend due process." (Am.Br.3.) While amici attempt to draw a distinction between, on the one hand, the admission of a hearsay statement as satisfying a minimum level of due process and, on the other hand, the positive authority required for the admission of evidence, *Hamdi* itself does not recognize this distinction. As noted below, *Hamdi*, acknowledging the Mobbs Declaration to be hearsay, expressly allows a "habeas court ... [to] accept affidavit evidence like that contained in the Mobbs Declaration...." 542 U.S. at 538, 124 S.Ct. 2633. *Hamdi* also rejected the district court's disap-

proval of the "hearsay nature of the Mobbs Declaration." *Id.* at 528, 124 S.Ct. 2633. In light of these statements, the Court is not convinced that *Hamdi* can be limited to the due process implications of the introduction of hearsay declarations. Had the Supreme Court intended to speak in such limited terms, surely it would not have given lower courts the impression that hearsay documents could be considered at the initial stage of an enemy combatant proceeding. Instead, if amici's argument were correct, the *Hamdi* Court would have, at a minimum, noted the potential for conflict between the consideration of the Mobbs Declaration and the Federal Rules of Evidence.

alleged combatant to present his own factual case to rebut the Government's return." *Id.* at 538, 124 S.Ct. 2633.

■ As with his earlier contention that *Hamdi's* allocation of the burdens of production and persuasion does not apply here, Petitioner's primary argument for distinguishing *Hamdi's* teaching on the consideration of hearsay statements is that *Hamdi* applies only when an alleged enemy combatant has been detained on a foreign battlefield. Having rejected this distinction earlier, the Court refuses to revive it now. As *Hamdi* applies to support Petitioner's detention as an enemy combatant, its instructions as to the process to which Petitioner is entitled also apply.[6]

■ *Hamdi*, then, clearly permits the introduction of the Rapp Declaration by Respondent at this initial stage of the enemy combatant proceeding.[7] Whether *Hamdi* allows this under the residual exception to the hearsay rule, as Respondent suggests (Resp.'s Rep. 17), or on some other basis, this Court is not free to disregard that holding now. *State Oil Co. v. Khan*, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (noting that the lower court was correct in applying prior Supreme Court decision despite disagreement with it because it is Supreme Court's prerogative alone to overrule one of its precedents). In any event, having determined that *Hamdi* authorizes the consideration of hearsay evidence at the initial stage of this enemy combatant proceeding, the Court need go no further. Whether the Rapp Declaration would be admissible during the later phases of such a proceeding is not a question before the Court today.

### b. Rapp Declaration

■ Once it is determined that the Rapp Declaration may be considered by the Court at this stage, it is apparent that the Declaration satisfies Respondent's burden of providing Petitioner with the factual basis supporting his detention as an enemy combatant. As summarized by the Magistrate Judge, the Declaration makes the following assertions:

A. Al–Marri trained at Bin Laden's Afghanistan terrorist training camp for 15–19 months between approximately 1996 and 1998. Training typically involved training in use of poisons, among other things.

B. In the summer of 2001 al-Marri was introduced by Khalid Shaykh Muhammed, September 11th mastermind, to Usamu Bin Laden, and al-Marri offered to be an al Qaeda martyr or do anything else al Qaeda requested. He was directed to enter the United States as a "sleeper agent," and to explore computer hacking methods to disrupt bank

---

**6.** Because of *Hamdi's* applicability here, the Court also rejects Petitioner's contention that he is entitled to discovery. *See Hamdi*, 542 U.S. at 528, 532, 124 S.Ct. 2633 (rejecting the district court's determination that "quite extensive discovery" is necessary for "meaningful judicial review.") (internal citations omitted); *see also* Fed. R. Gov. Sec. 2254 Cases 6 (providing that discovery is not automatic in habeas cases).

**7.** The Court notes that this enemy combatant proceeding is also a habeas proceeding. As such, this initial phase is analogous to the initial review of a petition for writ of habeas corpus, where the Court may consider affidavits or other evidence as warranting summary dismissal. *See* Fed. R. Gov. Sec. 2254 Cases 4; *see also* Fed. R. Gov. Sec. 2254 Cases 1 ("The district court may apply any or all of these rules to a habeas corpus petition not covered by Rule 1(a)."). In a habeas proceeding, the Court may, in fact, consider affidavits or other documents at later stages of the proceeding. Fed. R. Gov. Sec. 2254 Cases 7 ("Affidavits may also be submitted and considered as part of the record.").

records and the U.S. financial system. Through this relationship al-Marri began receiving assistance from Mustafa Ahmed Al–Hawsawi, an al Qaeda financier who maintained contact with and provided logistical support and funds for the September 11th hijackers.

C. Mustafa Ahmed Al–Hawsawi met al-Marri in Dubai in August 2001 and provided him $10,000 to $13,000 and $3000 to purchase a laptop computer. These funds were authorized by Khalid Shaykh Muhammed.

D. Al–Marri moved his family to the United States in September 2001 ostensibly to begin studies towards a graduate degree in computer sciences at Bradley University in the fall of 2001, but by December 2001 he rarely attended classes and was in failing status. Al–Marri previously obtained a bachelor's degree in business administration from Bradley University in 1991.

E. Analysis of al-Marri's laptop computer revealed research regarding use of chemical weapons of mass destruction including bookmarks relating to the purchase of chemicals such as potassium cyanide, sodium cyanide, sulfuric acid, and arsenic. Other information found on al-Marri's computer included references to instructions for making hydrogen cyanide, cyanide poisoning and antidotes, listings of chemical concentrations "Immediately Dangerous to Life and Health," "Toxicity Profiles: Cyanides," and other technical information concerning doses and lethal effects of various cyanides. Additional sites referenced on the computer involved computer hacking, computer identity masking, and the purchase and sale of credit card numbers.

F. Computer examination also revealed files concerning jihad, martyrdom, Arabic lectures by Bin Laden, and bookmarks to jihad and Taliban-related websites, photographs of the September 11th terrorist attack on the World Trade center and Arab prisoners of war held in Afghanistan, a map of Afghanistan, and an animated cartoon of an airplane flying into the World Trade Center.

G. Further examination of al-Marri's computer revealed over 1000 apparent credit card numbers stored in various computer files. Examination of credit card numbers led to the discovery of fraudulent charges to a business apparently established by al-Marri under an alias in Macomb, Illinois.

H. Examination of the inside of al-Marri's computer carrying case revealed a listing of approximately thirty-six credit card account numbers with names of the holders, expiration dates and designation of Mastercard or Visa. Al–Marri was not listed as an account holder for any card. Approximately one-half of the credit cards were issued by domestic banks to persons other than al-Marri and were either valid numbers or had been valid numbers.

I. Yahoo E-mail accounts admittedly belonging to al-Marri were created on a network operated by Western Illinois University in Macomb, Illinois, and three of the E-mail accounts contained draft E-mail messages to an E-mail account associated with Khalid Shaykh Muhammed. The messages were reporting on his enrollment in school and a telephone number at which al-Marri purportedly could be

reached. The telephone number, however, included a North Dakota area code and was not subscribed to by al-Marri. The telephone number is alleged to be a coded version of al-Marri's cell phone number.

J. Calling cards attributed to al-Marri were used in attempts to contact the United Arab Emirates telephone number of Mustafa Ahmed Al–Hawsawi. The calling cards were used from al-Marri's cell phone, his home phone, and pay telephones in Chicago, Peoria, and Springfield, Illinois.

(Report 6–9.) Affording this evidence a favorable presumption, as *Hamdi* directs, the Court finds that the Government has met its burden of providing a factual basis in support of Petitioner's classification and detention as an enemy combatant.

### 2. *Petitioner's Burden*

*Hamdi* provides that once the Government has offered evidence in support of its continued detention of an alleged enemy combatant, the detainee must be permitted "to present his own factual case to rebut the Government's return." 542 U.S. at 538, 124 S.Ct. 2633. In so doing, the detainee must present "more persuasive evidence" to overcome the facts offered by the Government. *Id.* at 534, 124 S.Ct. 2633.

In the instant case, the parties dispute the exact burden which each party bears. Respondent, for example, objects to the Magistrate Judge's conclusion that the Government at all times bears the burden of justifying Petitioner's detention by clear and convincing evidence. (Resp.'s Rep. 11 n. 3.) Petitioner, in objecting to *Hamdi's* application here, objects to any presumption in favor of the Government's evidence and to any burden being placed on Petitioner. (Pet's.Obj.17.) Although Petitioner's position must be—and has already been—rejected, the Court finds it unneces-sary to detail with exactness the burdens faced by the parties. This is so because the Government, by presenting the Rapp Declaration, has satisfied its initial burden of providing the factual basis for Petitioner's detention while Petitioner has offered nothing more than a general denial in support of his burden of presenting "more persuasive evidence." As summarized by the Magistrate Judge, Petitioner asserts:

A. He is a civilian who came to the United States lawfully to pursue a graduate degree at Bradley University.

B. He denies he came to the United States as an al Qaeda "sleeper agent" or he was otherwise a member of, or affiliated with, al Qaeda.

C. He generally denies the allegations contained in the Rapp [D]eclaration as well as his designation as an "enemy combatant."

D. He denies he entered the United States to commit "hostile or war-like acts," including acts of terrorism, or he is otherwise a member of, or affiliated with, al Qaeda.

(Report 10–11.)

Despite being given numerous opportunities to come forward with evidence supporting this general denial, Petitioner has refused to do so. Instead, he stated, "Petitioner respectfully declines at this time the Court's invitation to assume the burden of proving his own innocence, a burden that is unconstitutional, unlawful, and un-American." (Pet's. Resp. of May 4, 2006, 3.) As the Magistrate Judge noted, this stance by Petitioner ignores his responsibility to prosecute this habeas action under 28 U.S.C. § 2241. Petitioner also neglects his burden of persuasion on this habeas petition. *Garlotte v. Fordice,* 515 U.S. 39, 46, 115 S.Ct. 1948, 132 L.Ed.2d 36 (1995) ("[T]he habeas petitioner generally bears the burden of poof."). Most importantly—

and most critically for Petitioner—Petitioner's refusal to participate at this stage renders the Government's assertions uncontested. This leaves the Court with "nothing specific ... to dispute even the simplest of assertions [by the Government] which [Petitioner] could easily" refute were they inaccurate. (Report 12.) This puts Petitioner in an untenable position. As the Report notes:

> At the very least [Petitioner's refusal to dispute the Government's proffered facts] demonstrate[s] the lack of any effort on the part of the petitioner to establish the falsity of the [Rapp Declaration], to demonstrate the possibility of an erroneous deprivation, or otherwise meet his burden of persuasion.

> . . . . .

> [Petitioner] here has been given notice and opportunity, but has responded with merely a general denial and an election not to further participate in these proceedings.

> Neither due process nor the rule of law in general grant a party the right to participate only in the court procedures he deems best or to present his proof whenever it suits him. . . . The petitioner has squandered his opportunity to be heard by purposely not participating in a meaningful way.

(Report 14, 16.)

Given Petitioner's refusal to participate in the initial evidentiary process and his failure to offer *any* evidence on his behalf, it is beyond question that he has failed to present "more persuasive evidence" to rebut Respondent's classification and detention of him as an enemy combatant. Further, given the imbalance between the evidence presented by the parties, the Government clearly meets any burden of persuasion which could reasonably be imposed on it at this initial stage. Proceeding incrementally, as *Hamdi* directs, the Court need go no further today. Accordingly, under *Hamdi's* outline of the procedures applicable in enemy combatant proceedings, the Court finds that Petitioner has received notice of the factual basis supporting his detention and has been afforded a meaningful opportunity to rebut that evidence. As a review of that evidence does not indicate that an "erroneous deprivation" has occurred, *Hamdi*, 542 U.S. at 534, 124 S.Ct. 2633, this petition should be dismissed.

## V. CONCLUSION

Therefore, pursuant to the standard set forth above, the Court overrules Petitioner's objections to the Report, adopts the Report, and incorporates it herein to the extent that it does not contradict the terms of this Order. It is the judgment of this Court that this petition be, and the same is hereby, **DISMISSED.**

**IT IS SO ORDERED.**