NIEMEYER, Circuit Judge,
concurring in the judgment in part and dissenting in part, as indicated herein:
After we received briefs and heard argument in this case, the Supreme Court handed down its decision in Boumediene v. *342 Bush, —U.S. - 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), holding that foreign nationals detained at the U.S. Naval Station at Guantanamo Bay as enemy combatants under the Authorization for Use of Military Force (“AUMF”), Pub.L. No. 107-40,115 Stat. 224 (2001), have the privilege of habeas corpus. 128 S.Ct. at --, Slip op. at 41. The Court also held that when judicial power to issue habeas corpus is properly invoked by a detainee having the habeas privilege, “the judicial officer must have adequate authority to make a determination in light of the relevant law and facts and to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner’s release.” 128 S.Ct. at 2271. The Boumediene Court rejected the government’s argument that the Detainee Treatment Act of 2005, Pub.L. No. 109-148, 119 Stat. 2739, provided an adequate and effective substitute for habeas corpus and held that the Act’s limitation of habeas corpus violated the Suspension Clause of the Constitution.
Focusing on the essential process to which such detainees are entitled, whether through habeas corpus or some other procedure that Congress might provide, the Court stated that a detainee must have a “meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law” before a court that has “the power to order the conditional release of an individual unlawfully detained” — both of which are provided by the habeas corpus process. 128 S.Ct. at 2238 (internal quotation marks omitted). Thus, the Court held, the process for designated enemy combatants detained at Guantanamo Bay must provide the detainee with the right to present exculpatory evidence and to supplement the record, and the process must be administered by a court with authority “to assess the sufficiency of the Government’s evidence against the detainee,” “to admit and consider relevant exculpatory evidence,” to make determinations “in light of the relevant law and facts,” “to correct errors that occurred during the [executive] proceedings,” and to issue appropriate relief, including release of the detainee. 128 S.Ct. at 2271. In short, enemy combatants detained at Guantanamo Bay under the AUMF must be provided the habeas corpus process or a process closely equivalent to it. See 128 S.Ct. at-, slip op. at 63-64.
Because the Boumediene Court treated Guantanamo Bay as part of the United States for the limited purpose of its holding, its holding, a fortiori, extends also to persons detained in the United States as enemy combatants under the AUMF.
In my judgment, the Supreme Court’s holding in Boumediene disposes of the procedural issues before us. Because the district court in this case afforded al-Marri the habeas corpus process and dismissed his petition under procedures fully consistent with traditional habeas corpus process, I would conclude that al-Marri has received all the process he was due. And with respect to the district court’s legal conclusion that al-Marri was properly detained, I agree generally with the views expressed by Chief Judge Williams, Judge Wilkinson, and Judge Traxler, and I specifically join in Part II of Judge Traxler’s opinion. Accordingly, I would affirm.
I
Al-Marri was initially arrested by civilian authorities pursuant to charges of credit card fraud. While in civilian custody, however, the President of the United States determined, on June 23, 2003, that al-Marri was an enemy combatant because he was “closely associated with al Qaeda”; he “engaged in conduct that constituted *343 hostile and war-like acts, including conduct in preparation for acts of international terrorism that had the aim to cause injury to or adverse effects on the United States”; he possessed “intelligence about personnel and activities of al Qaeda”; he represented a “continuing, present, and grave danger to the national security of the United States”; and therefore it was necessary to detain him “to prevent him from aiding al Qaeda in its efforts to attack the United States.” Acting under the authority of the AUMF, the President ordered the Attorney General to deliver al-Marri to the Secretary of Defense to be detained “as an enemy combatant.” Al-Marri was then detained at the Consolidated Naval Brig in Charleston, South Carolina.
On July 8, 2004, al-Marri filed a petition for a writ of habeas corpus in the district court under 28 U.S.C. § 2241, alleging (1) unlawful detention, (2) the right to counsel, (3) the right to be charged, (4) a denial of due process, and (5) unlawful interrogation. His second and fifth claims are no longer a part of his petition in this proceeding but are now the subject of a separate civil action pending before the district court. In response to al-Marri’s petition, the district court entered an order directing service of al-Marri’s petition upon the Commander of the Consolidated Naval Brig and setting a date for his answer.
In his answer, the Commander asserted that al-Marri’s detention under the AUMF was proper, based on the President’s determination that al-Marri was an enemy combatant. The answer included a copy of the President’s determination and order, as well as an affidavit from Jeffrey N. Rapp, the Director of the Joint Intelligence Task Force for Combating Terrorism (the “Rapp Declaration”), which offered the specific factual basis for al-Marri’s classification as an enemy combatant. Portions of the Rapp Declaration were redacted to protect classified information.
Al-Marri filed a reply to the government’s answer, generally denying the facts and challenging his detention as a matter of law. He also requested a hearing to determine facts.
The district court first addressed the legal issues, and, assuming the facts asserted by the government to be true, it concluded as a legal matter that al-Marri’s detention was “proper pursuant to the AUMF.” Al-Marri v. Hanft, 378 F.Supp.2d 673, 680 (D.S.C.2005). But the court left open al-Marri’s right to challenge the facts.
At a status conference before a magistrate judge, the court outlined the procedure that would be followed to resolve al-Marri’s dispute of the facts. By an order dated December 19, 2005, the magistrate judge adopted an incremental factfinding approach based on the guidance provided by the Supreme Court in Hamdi v. Rumsfeld, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004). It required that al-Marri be given the government’s factual basis for his classification as an enemy combatant and a fair opportunity to rebut those facts with “more persuasive evidence.” For this purpose, the court indicated that it would accept affidavits from both the government and al-Marri. The court stated that if al-Marri were to make a showing “more persuasive” than the government’s showing, it would then conduct a full-blown hearing to take evidence.
Although al-Marri had received a redacted copy of the Rapp Declaration, he objected that he had not received notice of the factual basis for his detention because his attorneys were prohibited from discussing with him the classified portions of the Rapp Declaration. The district court expressed displeasure with the government’s provision of a redacted copy and *344 gave the government the option of either relying only on the unclassified portions of the Rapp Declaration or of allowing al-Marri access to the classified portions. In response, the government declassified most of the Rapp Declaration and accepted the sanction that it could not rely on the remaining classified portions to satisfy its burden.
In its summary, the declassified Rapp Declaration stated:
[Al-Marri] is closely associated with al Qaeda, an international terrorist organization with which the United States is at war. As detailed below, Al-Marri is an al Qaeda “sleeper” agent sent to the United States for the purpose of engaging in and facilitating terrorist activities subsequent to September 11, 2001. Al-Marri currently possesses information of high intelligence value, including information about personnel and activities of al Qaeda. Prior to arriving in the United States on September 10, 2001, Al-Marri met personally with Usama Bin Laden (Bin Laden) and volunteered for a martyr mission or to do anything else that al Qaeda requested. Al-Marri was assisted in his al Qaeda assignment to the United States by at least two high-level al Qaeda members: September 11, 2001 mastermind Khalid Shaykh Muhammed (KSM); and al Qaeda financier and September 11, 2001 money-man Mustafa Ahmed Al-Hawsawi (Al-Hawsawi). Al Qaeda sent Al-Marri to the United States to facilitate other al Qaeda operatives in carrying out post-September 11, 2001 terror attacks. Al Qaeda also asked Al-Marri to explore computer hacking methods to disrupt bank records and the U.S. financial system. In addition, Al-Marri was trained by al Qaeda in the use of poisons and had detailed information concerning poisonous chemicals stored on his laptop computer. Information about Al-Mar-ri’s relationship with and activities on behalf of al-Qaeda has been obtained from and corroborated by multiple intelligence sources.
The Declaration then proceeded, through 15 pages, to offer the highly specific details. For example, it stated that: (1) “Al-Marri trained at Bin Laden’s Afghanistan terrorist training camps for 15-19 months between approximately 1996 and 1998”; (2) although al-Marri allegedly entered the United States to pursue a graduate degree in computer science at Bradley University, “he had rarely attended classes and was in failing status”; (3) al-Marri traveled to the United Arab Emirates at al Qaeda’s request in August 2001, where he met with Mustafa Ahmed al-Hawsawi, al Qaeda’s treasurer, at the Dubai airport and was provided with approximately $10,000 to $13,000 for his travels and education in the United States, along with an additional approximately $3,000 to purchase a laptop computer; (4) al-Marri’s computer contained evidence that he was conducting research regarding the use of chemicals as weapons of mass destruction (providing very detailed descriptions of the evidence found on the computer); (5) al-Marri’s computer also contained records of e-mail drafts sent from accounts registered to al-Marri to an account that has been linked to Khalid Shaykh Muhammed, a known al Qaeda terrorist and mastermind behind the September 11 attacks (providing the exact language of the messages); (6) al-Marri’s computer contained files of lectures by bin Laden as well as lists of websites titled “Jihad arena,” “Tali-ban,” “Arab’s new club — Jihad club,” “Tunes by bullets,” and “martyrs,” along with photographs of the attacks on the World Trade Center, various photographs of Arab prisoners of war held by authorities in Kabul, an animated cartoon of an airplane flying at the World Trade Center, and a map of *345 Afghanistan; (7) calling cards attributed to al-Marri were utilized after the terrorist attacks of September 11, 2001, to contact the United Arab Emirates telephone number of al-Hawsawi (providing very specific dates and details regarding where and when the calls were made); (8) al-Marri’s computer ease contained lists of credit card numbers and the details of the relevant cardholders, and his computer files contained over 1,000 other apparent credit card numbers, along with lists of internet websites related to computer hacking, fake driver’s licenses and other fake identification cards, buying and selling credit card numbers, and processing credit card transactions; and (9) fraudulent purchases were made on several of the credit card numbers in al-Marri’s possession, at a fraudulent online business set up by an individual purporting to be named “Abdulkareem A. Almuslam,” who had a signature in handwriting similar to al-Marri’s, was identified by an eye doctor as actually being al-Marri, and had fingerprints that matched al-Marri’s.
When al-Marri received this declassified Rapp Declaration (in which only small portions remained redacted), he again objected because he could not see the few passages that had been blacked out. With respect to what was disclosed, he “respectfully decline[d]” to come forward with evidence. Because al-Marri elected not to make a factual showing, the magistrate judge prepared a report and recommendation to the district court based on al-Mar-ri’s refusal to take issue with the facts.
In the magistrate judge’s report and recommendation, he noted that al-Marri had received most of the Rapp Declaration, with only a few passages blacked out because they were classified, and stated that al-Marri “ha[d] been given notice and opportunity, but ha[d] responded with merely a general denial and an election not to further participate in these proceedings.” The judge noted that “[although [al-Marri] apparently has evidence he believes relevant, he refuses to present it before this court.” The magistrate judge concluded:
Accordingly, while recognizing the importance of respecting the acts of the Executive Branch in times of national emergency, and after providing the petitioner a threshold opportunity reasonable under the circumstances to contest the Executive Branch’s actions and factual assertions in an incremental and deliberate manner, it appears to the court that the Executive Declaration is more persuasive than Petitioner’s general denial on the issue of whether the petitioner meets the enemy combatant criteria, and there is no basis for concluding that an erroneous deprivation has occurred.
Al-Marri filed objections to the magistrate judge’s report and recommendation, and the district court considered al-Marri’s petition for writ of habeas corpus de novo. In its opinion, the court stated:
Despite being given numerous opportunities to come forward with evidence supporting this general denial, Petitioner has refused to do so.
* * *
Petitioner’s refusal to participate at this stage renders the Government’s assertions uncontested. This leaves the Court with “nothing specific ... to dispute even the simplest of assertions [by the Government] which [Petitioner] could easily” refute were they inaccurate.
Al-Marri ex rel. Berman v. Wright, 443 F.Supp.2d 774, 784-85 (D.S.C.2006) (quoting magistrate judge’s report) (alterations and omission in original). The court concluded:
*346 Given Petitioner’s refusal to participate in the initial evidentiary process and his failure to offer any evidence on his behalf, it is beyond question that he has failed to present “more persuasive evidence” to rebut Respondent’s classification and detention of him as an enemy combatant. Further, given the imbalance between the evidence presented by the parties, the Government clearly meets any burden of persuasion which could reasonably be imposed on it at this initial stage. Proceeding incrementally, as Hamdi directs, the Court need go no further today. Accordingly, under Hamdi’s, outline of the procedures applicable in enemy combatant proceedings, the Court finds that Petitioner has received notice of the factual basis supporting his detention and has been afforded a meaningful opportunity to rebut that evidence. As a review of that evidence does not indicate that an “erroneous deprivation” has occurred, Ham-di 542 U.S. at 534, 124 S.Ct. 2633, this petition should be dismissed.
Id. at 785. From the district court’s order of dismissal, al-Marri filed this appeal.
II
I conclude that the district court in this case provided al-Marri all the procedure that was due. While the court was disposing of a habeas corpus petition under 28 U.S.C. § 2241, it also kept its focus on the procedure described in Hamdi the only guidance then available to the district court for application of habeas corpus to detained enemy combatants. But it can be readily demonstrated that the procedure the district court provided al-Marri satisfied not only Hamdi but also § 2241, which the Court in Boumediene found to be sufficient.
A
Hamdi remains relevant to our consideration even in light of Boumediene. While Boumediene considered whether the Detainee Treatment Act was an adequate substitute for § 2241 habeas corpus, Ham-di considered the appropriate process due in a § 224-1 habeas proceeding. See Boumediene, 128 S.Ct. at 2269 (“[Hamdi ] does not control the matter at hand. None of the parties in Hamdi argued there had been a suspension of the writ. Nor could they. The § 2241 habeas corpus process remained in place”). As in Hamdi the § 2241 habeas corpus process “remain[s] in place” here.
In Hamdi a plurality of the Court articulated that process which is constitutionally owed to an American citizen seeking to challenge his classification and detention as an enemy combatant. There, Yaser Esam Hamdi, a United States citizen, was detained by the government on allegations that he had taken up arms with the Taliban during the conflict in Afghanistan. Hamdi had been seized in Afghanistan by members of the Northern Alliance, a coalition of military groups opposed to the Taliban, and was eventually turned over to the United States military and detained as an enemy combatant. Hamdi, 542 U.S. at 510, 124 S.Ct. 2633. Subsequently, Ham-di’s father filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241. Id. at 511,124 S.Ct. 2633.
Although Hamdi’s habeas petition contained no details regarding the factual circumstances of his capture or detention, other documents that were part of the record asserted that Hamdi “went to Afghanistan to do ‘relief work,’ and that he had been in that country less than two months before September 11, 2001, and could not have received military training.” Id. Furthermore, Hamdi’s father explained his view of the case — that Hamdi, who was *347 20 years old at the time, “was traveling on his own for the first time,” and “ ‘[b]ecause of his lack of experience, he was trapped in Afghanistan once the military campaign began.”’ Id. at 511-12, 124 S.Ct. 2633 (alteration in original). The sole evidence offered by the government against Hamdi was contained in an affidavit from Michael Mobbs, the Special Advisor to the Under Secretary of Defense for Policy (the “Mobbs Declaration”). Id. at 512, 124 S.Ct. 2633.
In its review, a plurality of the Supreme Court first looked at whether the detention of Hamdi, a U.S. citizen taken into custody in Afghanistan as an enemy combatant, was authorized. Confining its holding to the specific factual scenario before it and expressing no view as to the bounds of the enemy-combatant category, id. at 516, 124 S.Ct. 2633, the plurality held that Congress authorized the detention of enemy combatants, at least in the circumstances alleged in Hamdi’s case, id. at 516-17, 124 S.Ct. 2633.
The plurality then turned to the question of what process was constitutionally due a citizen who, in a habeas proceeding, disputed his status as an enemy combatant, ultimately declining to adopt either the narrow view of process advocated by the government or the broad view advocated by Hamdi. Id. at 524-34, 124 S.Ct. 2633. The plurality explained that “[b]oth of [the] positions highlight legitimate concerns. And both emphasize the tension that often exists between the autonomy that the Government asserts is necessary in order to pursue effectively a particular goal and the process that a citizen contends he is due before he is deprived of a constitutional right”; “[i]t is beyond question that substantial interests lie on both sides of the scale in this case.” Id. at 528, 529, 124 S.Ct. 2633. Recognizing that “the risk of erroneous deprivation of a citizen’s liberty in the absence of sufficient process ... [was] very real,” id. at 530, 124 S.Ct. 2633, the plurality held that a citizen-detainee seeking to challenge his classification as an enemy combatant must (1) “receive notice of the factual basis for his classification”; (2) be given “a fair opportunity to rebut the Government’s factual assertions”; and (3) have this process conducted “before a neutral decisionmaker,” id. at 533, 124 S.Ct. 2633. But the plurality was quick to point out the consequences of the practical requirements attending the government’s interests:
At the same time, the exigencies of the circumstances may demand that, aside from these core elements, enemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict. Hearsay, for example, may need to be accepted as the most reliable available evidence from the Government in such a proceeding.
Id. at 533-34, 124 S.Ct. 2633. In addition to allowing for hearsay in specified circumstances, the plurality recognized that a presumption in favor of the government’s evidence could be acceptable:
Likewise, the Constitution would not be offended by a presumption in favor of the Government’s evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided. Thus, once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria.
Id. at 534, 124 S.Ct. 2633. The plurality explained that such a burden-shifting scheme “would sufficiently address the ‘risk of an erroneous deprivation’ of a detainee’s liberty interest,” id. (quoting *348 Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)), and would “meet the goal of ensuring that the errant tourist, embedded journalist, or local aid worker has a chance to prove military error while giving due regard to the Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant,” id.
Finally and particularly apropos here, the Hamdi plurality stated that “a habeas court in a case such as this may accept [hearsay] affidavit evidence like that contained in the Mobbs Declaration, so long as it also permits the alleged combatant to present his own factual case to rebut the Government’s return.” Hamdi, 542 U.S. at 538, 124 S.Ct. 2633. Ultimately, the plurality envisioned “a factfinding process that is both prudent and incremental.” Id. at 539, 124 S.Ct. 2633 (emphasis added).
Here, the government detained al-Marri, based on facts much better developed and more detailed than those presented in Hamdi, and al-Marri was given a habeas corpus process consistent with the process described in Hamdi. He was given notice of the factual basis for his designation as an enemy combatant and “a meaningful opportunity to contest the factual basis for that detention before a neutral decision-maker.” * Hamdi, 542 U.S. at 509, 124 S.Ct. 2633 (emphasis added).
First, as for notice, al-Marri was provided the Rapp Declaration, which contained a full statement of the factual basis for the government’s determination that he was an enemy combatant. The Rapp Declaration set forth clearly and comprehensively the government’s theory of the case, providing specific details of the basis for the government’s assertions.
Second, al-Marri was undoubtedly given “a fair opportunity to rebut the Government’s factual assertions.” Hamdi, 542 U.S. at 533, 124 S.Ct. 2633. In its statements to the district court, the government invited and urged al-Marri “to actually respond in a substantive way to the factual allegations” made by the government, observing that “[t]his is [al-Marri’s] opportunity to be heard on ... his version of [the] events. That’s the primary purpose for this process, as we read the Supreme Court’s Hamdi decision.” (J.A. 132-33, 134). In addition, the district court directed al-Marri to respond to the government’s factual assertions. In its December 19, 2005 order, the court instructed al-Marri “to file any rebuttal evidence [to the government’s factual assertions] within sixty days from the date hereof.” Yet, al-Marri did not respond in any substantive way. Even though he had been given the government’s factual assertions — indeed, many months before the court ordered him to respond, during which time he had unmonitored access to his attorneys — he still refused to provide any explanation to the court or to state his own version of the facts. Rather, his response was simply to *349 give a general denial and to decline further engagement in the process.
In Hamdi, the plurality stated that “once the Government puts forth credible evidence that the habeas petitioner meets the enemy-combatant criteria” (which could be satisfied by a hearsay affidavit such as the Rapp Declaration, see 542 U.S. at 533-34, 538, 124 S.Ct. 2633), the burden shifts to the detainee “to rebut that evidence with more persuasive evidence that he falls outside the criteria.” Id. at 534, 124 S.Ct. 2633 (emphasis added). Al-Mar-ri did not even attempt to carry this burden.
The Hamdi plurality explained that this burden-shifting scheme did not impose a large burden on the detainee but rather was designed to allow him to show that he is an innocent “tourist, ... journalist, or ... aid worker.” 542 U.S. at 534, 124 S.Ct. 2633. The approach of this scheme was “limited to [rebutting or challenging] the alleged combatant’s acts.” Id. at 535, 124 S.Ct. 2633. Thus, this narrow focus required al-Marri only “to present his own factual case to rebut the Government’s return.” Id. at 538, 124 S.Ct. 2633 (emphasis added). Indeed, in this case, almost every important fact on which the government relied was imputable to al-Marri directly and could be responded to through his own personal knowledge.
For example, the Rapp Declaration cited specific dates and times when the government alleged al-Marri was in specific places taking specific actions — all facts that would have been known to al-Marri personally. Al-Marri could thus have contested or explained, among other things: (1) the source of his financial support, if it was not al-Hawsawi, as alleged; (2) the assertions that he rarely attended his graduate courses and was in failing status; (3) the allegations that his laptop computer contained research regarding the use of chemical weapons and poisons, as well as files concerning jihad and martyrdom, lectures of Osama bin Laden, and thousands of false credit card numbers and other fraudulent financial documents; and (4) the facts that he possessed and used telephone credit cards, telephone numbers, and e-mail accounts connected to known al Qaeda operatives and leaders. Because the accuracy of these facts would have been known by al-Marri personally, he could have offered an explanation for or denial of each, if the government’s characterizations and explanations were untrue. Yet, he chose to “respectfully decline” the district court’s “invitation” to respond to or contest them. His failure to rebut such facts amounted to a total failure to meet his burden under the burden-shifting scheme of Hamdi. As a result, there was nothing specific before the district court, and there remains nothing specific before our court, to dispute even the simplest of assertions against al-Marri, despite the fact that he was given “a fair opportunity to rebut the Government’s assertions.” Hamdi 542 U.S. at 533, 124 S.Ct. 2633.
Finally, the third prong of the process articulated in Hamdi was fulfilled. Al-Marri unquestionably received the opportunity to challenge the government’s factual assertions “before a neutral decision-maker.” Hamdi, 542 U.S. at 533, 124 S.Ct. 2633. A duly appointed and experienced federal district court judge entertained al-Marri’s arguments regarding his habeas petition, and ultimately decided to reject them and deny his petition. There has been no allegation that the district court was in any way biased. Indeed, the court gave al-Marri ample opportunity to make his case.
In sum, al-Marri was given notice of the government’s facts, allowing for a presumption in its favor under Hamdi he was given a fair opportunity to respond to *350 the asserted facts; and his proceeding in which he could contest the facts was before a neutral decisionmaker. This is all of the process that was due him under Hamdi.
B
Although the district court in this case was functioning under 28 U.S.C. § 2241 and was attempting at the same time to accommodate the process described in Hamdi the process it actually afforded al-Marri readily comported with both § 2241 and Hamdi thus including the elements described as essential in Boumediene.
The Boumediene Court allowed that some process short of that required by § 2241 process could be sufficient. 128 S.Ct. at 2274 (stating, “we do not hold that an adequate substitute must duplicate § 2241 in all respects”). It nonetheless found essential in any process employed that (1) the petitioner be given the opportunity to submit exculpatory evidence and to supplement the record on review; and (2) the court have authority to assess the sufficiency of the government’s evidence, to receive the petitioner’s exculpatory evidence, to supplement the record, to correct errors in the executive process, and to grant relief, including release of the detainee. 128 S.Ct. at 2271-72, 2275.
The process in this case readily fulfilled these minimum requirements. Indeed, it satisfied all of those imposed by 28 U.S.C. §§ 2241-2243.
Al-Marri was given a detailed 15-page statement of the facts — stated under oath — on which the government was relying. Even though most, if not all, of the facts were within al-Marri’s personal knowledge, he elected not to dispute them or present other facts, giving instead only a general denial and a refusal to participate further in the process. Likewise, he did not request that anything further be included in the record. Thus, his challenge amounted to only a legal challenge to the AUMF and the President’s right to detain him under the AUMF. Nevertheless, he was given the opportunity to raise factual disputes, and the court would have resolved them with a factual hearing, as it so advised al-Marri. The district court, operating under § 2241, had the full authority to receive evidence from al-Marri and to supplement the record, and it urged al-Marri to respond to the facts.
The court also understood that it had authority to rule that the detainment was illegal as a matter of law. With that authority, it devoted an entire memorandum to the issue, denying al-Marri’s legal challenge. Had it sustained al-Marri’s arguments, the court, as a habeas court, surely had the authority under § 2241 to fashion appropriate relief, including release. Indeed, it exercised this power at an earlier stage when it sanctioned the government by excluding consideration of classified information. In short, the court’s process in this case was fully compliant with the essential process described in Boumediene.
In addition, the district court comported fully with the process required by § 2241. Section 2243 requires that al-Marri’s custodian be ordered to file an answer (a “return”), “certifying the true cause of the detention.” That order was issued in this case and the government filed an answer, providing the “true cause of the detention.”
Section 2243 also requires a hearing at which the detainee is present, “[u]nless the application for the writ and the return present only issues of law.” This too was satisfied. Since al-Marri raised no issue of fact, the hearings before the magistrate judge involved only legal arguments.
Section 2243 requires that al-Marri be afforded the opportunity, by affidavit or otherwise under oath, to deny facts or to *351 assert other facts. This opportunity was given him, but al-Marri opted not to take advantage of it.
Finally, § 2243 requires the court to “dispose of the matter as law and justice require.” This the court did. In disposing of the matter as law and justice required, the district court accepted the government’s facts as true — it had no others before it — and concluded, based on those facts, that as a matter of law al-Marri was legally detained by the President under the AUMF.
Al-Marri received the process described in Hamdi, Boumediene, and 28 U.S.C. §§ 2241-2243. That he elected not to contest facts to require their further development was his choice, not a denial of process. And on his purely legal challenge he received a full hearing with a reasoned disposition.
III
With respect to the legal question decided by the district court that al-Marri was legally detained under the AUMF based on the facts the government presented, I agree with the opinions of Chief Judge Williams, Judge Wilkinson, and Judge Traxler, which conclude that, based on the Rapp Declaration, the President had the power to detain al-Marri as an enemy combatant under the AUMF and that the President lawfully exercised that power in detaining al-Marri. I specifically join Part II of Judge Traxler’s opinion, laying out the reasons.
IV
Accordingly, I concur in that part of the judgment affirming the district court’s conclusion that the President possessed the legal authority under the AUMF to detain al-Marri as an enemy combatant and that he did so in accordance with the AUMF. I dissent, however, from the decision to vacate the district court’s dismissal order and to remand this case to the district court to provide al-Marri with more process to contest his detention. In my judgment, because al-Marri has already received a § 2241 habeas process, such a remand order leads only to duplicative process, unnecessarily protracting the constitutionally fair and adequate process that the district court already provided al-Mar-ri.
Accordingly, I would affirm the judgment of the district court.

 Al-Marri objects to the district court's denial of his motion for disclosure by the government of an array of sources and witnesses, and Judge Traxler's opinion suggests al-Marri may be entitled to such discovery even before placing any of the government’s facts in dispute. But in a factfinding process that is to be "both prudent and incremental,” taking into account the Executive’s unique interests in detaining enemy combatants during wartime, Hamdi, 542 U.S. at 539, 124 S.Ct. 2633, it would be inappropriate for us to consider these discovery requests without first requiring the petitioner to at least constructively respond to the government’s detailed factual submission, particularly in a case such as this in which all relevant facts are within the petitioner's personal knowledge. Absent some credible theory to rebut the government’s factual case, a court has no basis to contemplate further steps such as discovery or an evidentiary hearing.