TRAXLER, Circuit Judge,
concurring in the judgment:
Ali Saleh Kahlah al-Marri (“al-Marri”), a citizen of Qatar and alleged operative of the al Qaeda terrorist network, was designated an enemy combatant by the President of the United States and is currently being detained at the Naval Consolidated Brig in Charleston, South Carolina. According to evidence submitted by the government in support of al-Marri’s military detention, al-Marri received training and funding from al Qaeda prior to the September 11 attacks perpetrated by that organization and entered this country as a “sleeper agent” charged with carrying out additional terrorist activities on its behalf. Al-Marri now appeals the district court’s decision dismissing his habeas petition, filed under 28 U.S.C.A. § 2241, challenging the President’s authority to designate him an enemy combatant and militarily detain him as such. In the alternative, al-Marri challenges the process he has been afforded by the district court to contest the factual basis for his designation.
I agree with my colleagues who hold that the Authorization for Use of Military Force (“AUMF”), Pub.L. No. 107-40, 115 Stat. 224 (2001), enacted by Congress in the wake of the 9/11 attacks, grants the President the power to detain enemy combatants in the war against al Qaeda, including belligerents who enter our country *254 for the purpose of committing hostile and war-like acts such as those carried out by the al Qaeda operatives on 9/11. And, I agree that the allegations made by the government against al-Marri, if true, would place him within this category and permit the President to militarily detain him.
However, I depart from my dissenting colleagues on the issue of whether al-Marri has been afforded a fair opportunity to challenge the factual basis for his designation as an enemy combatant. Because the process afforded al-Marri by the district court to challenge the factual basis for his designation as an enemy combatant did not meet the minimal requirements of due process guaranteed by the Fifth Amendment, I would reverse the district court’s dismissal of al-Marri’s habeas petition and remand for further evidentiary proceedings on the issue of whether al-Marri is, in fact, an enemy combatant subject to military detention.
I. Background
As is now tragically well-known, on September 11, 2001, operatives of the al Qaeda terrorist network hijacked commercial airliners on the East Coast and launched an attack upon the United States, successfully striking the World Trade Center and the Pentagon, and crashing a third airliner, believed to have been bound for an additional target in Washington, D.C., in Pennsylvania. Approximately 3,000 civilians were killed as a result of these war-like attacks.
One week after these devastating attacks, Congress passed the AUMF, providing that
the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.
Id. (emphasis added). The preamble to the AUMF references the President’s “authority under the Constitution to take action to deter and prevent acts of international terrorism against the United States,” points to the continued “unusual and extraordinary threat to the national security and foreign policy of the United States” posed by the forces responsible for the 9/11 attacks, and declares that it is “both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad.” Id. (emphasis added).
Having determined that the 9/11 attacks were inflicted by operatives of al Qaeda who were sent to our country to attack us from within, and that al Qaeda was heavily supported and harbored by the Taliban government of Afghanistan, the President responded militarily against both entities by ordering our armed forces to Afghanistan.
On September 10, 2001, the day before al Qaeda’s devastating attack upon our homeland, al-Marri entered the United States from abroad with his wife and children, ostensibly for the purpose of pursuing a degree at Bradley University in Peoria, Illinois. Two months later, FBI agents arrested al-Marri as a material witness in the investigation of the 9/11 attacks. In the course of their investigation, the authorities discovered that al-Marri was rarely attending his university classes and was failing his courses. Additional investigation resulted in al-Marri being charged with several federal criminal of *255 fenses.[1] Al-Marri pled not guilty and trial was set to begin in the district court of Illinois on July 21, 2003.
On June 28, 2003, however, President George W. Bush declared that al-Marri “is, and at the time he entered the United States in September 2001 was, an enemy combatant.” J.A. 54. According to the presidential declaration, “al-Marri is closely associated with al Qaeda, an international terrorist organization with which the United States is at war” and “engaged in conduct that constituted hostile and warlike acts, including conduct in preparation for acts of international terrorism that had the aim to cause injury to or adverse effects on the United States.” J.A. 54. The President additionally declared that “al-Marri possesses intelligence, including intelligence about personnel and activities of al Qaeda that, if communicated to the [United States], would aid [United States’] efforts to prevent attacks by al Qaeda on the United States or its armed forces, other governmental personnel, or citizens,” and that he “represents a continuing, present, and grave danger to the national security of the United States.” J.A. 54. Accordingly, the President declared that the “detention [of al-Marri] is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States or its armed forces, other governmental personnel, or citizens” and that “it is in the interest of the United States that the Secretary of Defense detain [him] as an enemy combatant.” J.A. 54.
In the wake of this declaration, the government successfully moved to dismiss the criminal indictment pending in the district court of Illinois, asserting national security interests required that al-Marri be transferred from civilian to military custody.[2] Al-Marri was transferred to the custody of the Secretary of Defense and transported to the Naval Consolidated Brig in Charleston, where he has remained in military custody as an enemy combatant.
On July 8, 2003, approximately two weeks after al-Marri was transferred from civilian to military custody, al-Marri’s legal counsel filed a petition for a writ of habeas corpus in the district court of Illinois challenging the President’s designation and al-Marri’s continued detention by the military. The petition was eventually dismissed for lack of jurisdiction, see Al-Marri v. Rumsfeld, 360 F.3d 707 (7th Cir. 2004), but re-filed in the United States District Court for the District of South Carolina.
In his petition, al-Marri claimed that his military detention was unlawful, that the government was required to charge him with a crime or release him, and that the government abridged his due process *256 rights. Al-Marri asserted that as a civilian lawfully residing in the United States, he was unlawfully “detained by the military without basis, without charge, without access to counsel, and without being afforded any process by which he can challenge his detention or his designation as an enemy combatant.” J.A. 21.[3] Al-Marri also demanded that a hearing be scheduled at which the government should be “compelled to present evidence establishing that [al-Marri] is, in fact, an enemy combatant, and at which [al-Marri] is afforded an opportunity to challenge such designation with the assistance of counsel.” J.A. 25.
The government thereafter filed its response to al-Marri’s petition, supported by a hearsay declaration of Jeffrey N. Rapp, identified as the Director of the Joint Intelligence Task Force for Combating Terrorism (the “Rapp Declaration”). In this affidavit, Rapp professed to be “familiar with the interviews of [al-Marri] conducted by agents of the Federal Bureau of Investigation and by personnel of the Department of Defense (DOD) once the DOD took custody of Al-Marri ... after he was declared an enemy combatant by the President.” J.A. 213. The Rapp Declaration summarized the national intelligence and other federal investigative information upon which the President rested his determination that al-Marri was not simply a man bent on committing criminal activities for personal reasons or gain, but an al Qaeda operative or soldier dispatched to this country to perpetrate or facilitate additional war-like attacks in the wake of the 9/11 attacks. According to the Rapp Declaration, “Al-Marri is an al Qaeda ‘sleeper’ agent sent to the United States for the purpose of engaging in and facilitating terrorist activities subsequent to September 11, 2001,” and “possesses information of high intelligence value, including information about personnel and activities of al Qaeda.” J.A. 216. Prior to his arrival in this country, he was “trained at Bin Laden’s Afghanistan terrorist training camps” and, “[a]mong other things, ... received training in the use of poisons at an al-Qaeda camp.” J.A. 217. He “met personally with Usama Bin Laden ... and volunteered for a martyr mission or to do anything else that al Qaeda requested.” J.A. 216. The Rapp Declaration asserted that al-Marri was assisted in his al Qaeda assignment to the United States by known al Qaeda members, including “[9/11] mastermind Khalid Shaykh Muhammed” and “al Qaeda financier and [9/11] moneyman Mustafa Ahmed Al-Hawsawi.” J.A. 216. He traveled to the United States with money provided for him by al Qaeda for the purpose of carrying out his assigned mission.
In response, al-Marri asserted that, even if the allegations were true, the President lacked authority to detain him as an enemy combatant. However, al-Marri also denied the factual allegations supporting his classification and asserted that he was “entitled to a fair opportunity to rebut the factual assertions on which his classifica *257 tion as an ‘enemy combatant’ [was] based and to an evidentiary hearing conducted consistent with the fundamental requirements of due process, including, most importantly, the right to confront and cross-examine the witnesses against him.” J.A. 69. According to al-Marri, “[ajnything less would make his right to due process illusory.” J.A. 69.
As discussed in more detail below, the district court rejected al-Marri’s assertion that the President lacked the authority to detain him as an enemy combatant, see Al-Marri v. Hanft, 378 F.Supp.2d 673 (D.S.C.2005), and, in a later decision, dismissed al-Marri’s habeas petition based upon its determination that he had failed to rebut the allegations upon which his designation rested, see Al-Marri v. Wright, 443 F.Supp.2d 774 (D.S.C.2006). On appeal, al-Marri challenges the district court’s determination that the President can detain him as an enemy combatant and, in the alternative, asserts that he was not afforded a meaningful opportunity to contest his status. I address each issue in turn.
II. The Authority to Detain
I begin with the district court’s denial of al-Marri’s motion for summary judgment based upon its determination that, assuming the allegation of the Rapp Declaration to be true, the President possessed legal authority under the AUMF to detain al-Marri as an enemy combatant in the war against al Qaeda even though al-Marri had successfully crossed our borders and was residing within this country at the time of his seizure. See Al-Marri, 378 F.Supp.2d at 680. Al-Marri asserts that the President lacks legal authority to designate and detain him as an enemy combatant because he was taken into custody in the United States and, as a result, enjoyed “civilian” status and its accompanying rights to full criminal process for his alleged wrongdoing. The government counters that both the AUMF and the President’s inherent constitutional authority allowed for the detention.
A.
As pointed out by my colleagues, the Constitution generally affords all persons detained by the government the right to be charged and tried in a criminal proceeding for suspected wrongdoing, and it prohibits the government from subjecting individuals arrested inside the United States to military detention unless they fall within certain narrow exceptions. See United States v. Salerno, 481 U.S. 739, 755, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (“In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.”). The detention of enemy combatants during military hostilities, however, is such an exception. If properly designated an enemy combatant pursuant to legal authority of the President, such persons may be detained without charge or criminal proceedings “for the duration of the relevant hostilities.” Hamdi v. Rumsfeld, 542 U.S. 507, 519-521, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004).
The Supreme Court first considered the breadth of the AUMF’s grant of such authority in Hamdi, a case which originated from this circuit. Hamdi was captured by our allies in Afghanistan and turned over to our military personnel there. When it was discovered that he was a United States citizen by birth, Hamdi was transported to the United States for continued detention here. A plurality of the Court ruled that “individuals who fought against the United States in Afghanistan as part of the Taliban, an organization known to have supported the al Qaeda terrorist network responsible for [the 9/11] attacks, are individuals Congress sought to target in passing the AUMF.” Id. at 518, 124 S.Ct. 2633. *258 Although the AUMF did not specifically authorize such military detention, the plurality “conclude[d] that detention of individuals falling into the limited category we are considering, for the duration of the particular conflict in which they were captured, is so fundamental and accepted an incident to war as to be an exercise of the ‘necessary and appropriate force’ Congress has authorized the President to use.” Id.-, see also id. at 519, 124 S.Ct. 2633 (“Because detention to prevent a combatant’s return to the battlefield is a fundamental incident of waging war, in permitting the use of ‘necessary and appropriate force,’ Congress has clearly and unmistakably authorized detention in the narrow circumstances considered here.”).
Because Hamdi was “part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there,” id. at 516, 124 S.Ct. 2633 (internal quotation marks omitted), the plurality concluded that, even though he was a United States citizen detained within this country, he clearly fell within the legal category of those “enemy combatants” who may be detained. However, in the course of rejecting Hamdi’s claim that his citizenship prohibited his detention as an enemy combatant, the plurality also recognized the Court’s precedent in Ex parte Quirin, 317 U.S. 1, 63 S.Ct. 1, 87 L.Ed. 3 (1942), which “held that ‘[cjitizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents within the meaning of ... the law of war.’ ” Hamdi, 542 U.S. at 519, 124 S.Ct. 2633 (quoting Quirin, 317 U.S. at 37-38, 63 S.Ct. 2).
This court also considered the scope of the AUMF in Padilla v. Hanft, 423 F.3d 386 (4th Cir.2005), albeit in a somewhat different context. There we held that the AUMF was broad enough to authorize the military detention of Jose Padilla, “a citizen of this country who is closely associated with al Qaeda, an entity with which the United States is at war; who took up arms on behalf of that enemy and against our country in a foreign combat zone of that war; and who thereafter traveled to the United States for the avowed purpose of further prosecuting that war on American soil, against American citizens and targets.” Id. at 389. In so holding, we also relied upon the Supreme Court’s decision in Quirin, which dealt with “the military trial of Haupt, a United States citizen who entered th[is] country with orders from the Nazis to blow up domestic war facilities but was captured before he could execute those orders.” Id. at 392. Noting that, “[l]ike Haupt, Padilla associated with the military arm of the enemy, and with its aid, guidance, and direction entered this country bent on committing hostile acts on American soil,” we held that Padilla “falls within Quirin’s definition of enemy belligerent, as well as within the definition of the equivalent term [enemy combatant] accepted by the plurality in Hamdi.” Id. We concluded:
The Congress of the United States, in the Authorization for Use of Military Force Joint Resolution, provided the President all powers necessary and appropriate to protect American citizens from terrorist acts by those who attacked the United States on September 11, 2001. As would be expected, and as the Supreme Court has held, those powers include the power to detain identified and committed enemies such as Padilla, who associated with al Qaeda and the Taliban regime, who took up arms against this Nation in its war against these enemies, and who entered the United States for the avowed purpose of further prosecuting that war by attack *259 ing American citizens and targets on our own soil — a power without which, Congress understood, the President could well be unable to protect American citizens from the very kind of savage attack that occurred four years ago almost to the day.
Id. at 397. Accordingly, we reversed the district court’s determination that the detention of Padilla by the President was without legal support, necessitating additional proceedings below.[4]
B.
Like my colleagues, I agree that neither Hamdi nor Padilla compels the conclusion that the AUMF authorized the President to detain al-Marri as an enemy combatant, although they do provide guidance. I disagree, however, that Ex Parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866), compels the opposite conclusion. Having carefully considered these cases, as well as the Supreme Court’s decision in Quirin, I am of the opinion that the AUMF also grants the President the authority to detain enemy combatants who associate themselves “with al Qaeda, an entity with which the United States is at war,” and “travel[] to the United States for the avowed purpose of further prosecuting that war on American soil, against American citizens and targets,” even though the government cannot establish that the combatant also “took up arms on behalf of that enemy and against our country in a foreign combat zone of that war.” Padilla, 423 F.3d at 389 (emphasis added).
1.
As accurately pointed out by my colleagues, the alleged enemy combatants in Hamdi and Padilla were affiliated with the military arm of an enemy government, specifically the Taliban government of Afghanistan. By virtue of the alleged combatant’s affiliation with the Taliban government, neither court was required to decide whether their affiliation with al Qaeda and, in the case of Padilla, the mission to carry out additional terrorist acts within this country, would also have supported their detention as enemy combatants.
In my opinion, however, there is no doubt that individuals who are dispatched here by al Qaeda, the organization known to have carried out the 9/11 attacks upon our country, as sleeper agents and terrorist operatives charged with the task of committing additional attacks upon our homeland “are [also] individuals Congress sought to target in passing the AUMF.” Hamdi 542 U.S. at 518, 124 S.Ct. 2633. Citing the right of the United States “to protect United States citizens both at home and abroad,” the AUMF authorized the President’s use of “all necessary and appropriate force against” the nations and organizations that “planned, authorized, *260 committed, or aided” the 9/11 attacks, “or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States.” 115 Stat. 224. Clearly, Congress was not merely authorizing military retaliation against a reigning foreign government known to have supported the enemy force that attacked us in our homeland, but was also authorizing military action against al Qaeda operatives who, like the 9/11 hijackers, were sent by the al Qaeda organization to the United States to conduct additional terror operations here.
As persuasively pointed out by the government, it was the 9/11 attacks which triggered the passage of the AUMF. The al Qaeda operatives who successfully carried out those attacks entered this country under false pretenses for the purpose of carrying out al Qaeda orders and, while finalizing the preparations for these attacks, maintained a facade of peaceful residence until the very moment they boarded the commercial airliners that they used as weapons. The hijackers never engaged in combat operations against our forces on a foreign battlefield. Yet al-Marri would have us rule that when Congress authorized the President to deal militarily with those responsible for the 9/11 attacks upon our country, it did not intend to authorize the President to deal militarily with al Qaeda operatives identically situated to the 9/11 hijackers. There is nothing in the language of the AUMF that suggests that Congress intended to limit the military response or the presidential authorization to acts occurring in foreign territories, and it strains reason to believe that Congress, in enacting the AUMF in the wake of those attacks, did not intend for it to encompass al Qaeda operatives standing in the exact 'position as the attackers who brought about its enactment. Furthermore, Congress has not revised or revoked the AUMF since its enactment or since the Supreme Court decided Hamdi
I am also unpersuaded by the claim that because al Qaeda itself is an international terrorist organization instead of a “nation state” or “enemy government,” the AUMF cannot apply, consistent with the laws of war and our constitutional guarantees, to such persons. The premise of that claim seems to be that because al Qaeda is not technically in control of an enemy nation or its government, it cannot be considered as anything other than a criminal organization whose members are entitled to all the protections and procedures granted by our constitution. I disagree.
In my view, al Qaeda is much more and much worse than a criminal organization. And while it may be an unconventional enemy force in a historical context, it is an enemy force nonetheless. The fact that it allied itself with an enemy government of a foreign nation only underscores this point, rendering attempts to distinguish its soldiers or operatives as something meaningfully different from military soldiers in service to the Taliban government (or al Qaeda operatives such as Hamdi and Padilla, who fought beside them) equally strained. The President attacked the Taliban in Afghanistan as retaliation for al Qaeda’s strike upon our nation because al Qaeda was centralized there and allied with the Taliban, and it also strains credulity to assert that while we are legitimately at war with the Taliban government, we cannot be at war with al Qaeda.
In sum, the war that al Qaeda wages here and abroad against American interests may be viewed as unconventional, but it is a war nonetheless and one initially declared by our enemy. See Hamdi v. Rumsfeld, 296 F.3d 278, 283 (4th Cir.2002) (noting that “[t]he unconventional aspects of the present struggle do not make its stakes any less grave”); Padilla, 423 F.3d *261 at 389 (noting that al Qaeda is “an entity with which the United States is at war”). The members of this enemy force come from different countries and they are positioned globally. They fight us with conventional weapons in Afghanistan and Iraq, but they have also infiltrated our borders and those of our allies, bent on committing, at a minimum, sabotage and other war-like acts targeting both military and civilian installations and citizens. While they do not hail from a single nation state, they are not really so dissimilar from the multi-national forces united against the United States and its allies in the conventional wars that we are more comfortable discussing. And when they cross our borders with the intent to attack our country from within on behalf of those forces, they are not appreciably different from the soldiers in Quirin, who infiltrated our borders to commit acts of sabotage against our military installations here— although as history and intelligence inform us, al Qaeda soldiers target not only our military installations, but also the citizens of this country. Nor does it matter that “they have not actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations.” Quiñn, 317 U.S. at 38, 63 S.Ct. 2. When they enter this country “with hostile purpose,” they are enemy belligerents subject to detention. Id.
In my view, limiting the President’s authority to militarily detain soldiers or saboteurs as enemy combatants to those who are part of a formal military arm of a foreign nation or enemy government is not compelled by the laws of war, and the AUMF plainly authorizes the President to use all necessary and appropriate force against al Qaeda. I believe this necessarily includes the detention of al Qaeda operatives who associate with the enemy, be that the al Qaeda organization or the Taliban government, “and with its aid, guidance and direction enter this country bent on hostile acts.” Id. at 37-38, 63 S.Ct. 2. Accordingly, I find it unnecessary to reach the question of whether the President possesses inherent authority to detain al-Mar-ri.
2.
If the allegations of the Rapp Declaration are true, I am also of the view that al-Marri would fall within the category of persons who may be lawfully detained pursuant to the authority granted by the AUMF.
According to Rapp, al-Marri was not simply a civilian who lawfully entered the United States and was residing peacefully here while pursuing a higher educational goal. Nor, for that matter, was he a civilian who became sympathetic to al-Qaeda’s mission and sought to support it in indirect ways. And he was certainly not a common criminal bent on committing criminal acts for personal reasons or gain. On the contrary, the allegations are that al-Marri directly allied himself with al Qaeda abroad, volunteered for assignments (including a martyr mission), received training and funding from al Qaeda abroad, was dispatched by al Qaeda to the United States as an al Qaeda operative with orders to serve as a sleeper agent, and was tasked with facilitating and ultimately committing terrorist attacks against the United States within this country. Unlike the al Qaeda operatives who preceded him, al-Marri was unsuccessful in his mission. But with this exception — owing to the efforts of our federal authorities here — he would not be appreciably different from either the German soldier dispatched here to attack military installations in Quinn or the al Qaeda operatives dispatched here to attack this country on 9/11. As noted by the magistrate judge, “[assuming ... that all of the facts asserted by [the government] are *262 true, [al-Marri] attended an al Qaeda terror training camp and later, on September 10, 2001, entered this country to continue the battle that the September 11th hijackers began on American soil.” J.A. 123.
For these reasons, I agree that, assuming the allegations of the Rapp Declaration to be true, al-Marri would fall within the definition of an enemy combatant and that his military detention would be authorized pursuant to the AUMF.
III. Due Process
While I agree with my colleagues who would hold that the President has the legal authority under the AUMF to detain al-Marri as an enemy combatant for the duration of the hostilities, we part company on the issue of whether the process afforded al-Marri to challenge his detention was sufficient to meet the minimum requirements of due process of law. In my opinion, due process demands more procedural safeguards than those provided to al-Marri in the habeas proceedings below.
A.
Consideration of “the question of what process is constitutionally due to a [person] who disputes his enemy-combatant status” begins with consideration of the Supreme Court’s decision in Hamdi, which addressed not only the legal authority of the President to detain enemy combatants but also the process due to those so designated. Hamdi, 542 U.S. at 524, 124 S.Ct. 2633.
Hamdi was captured on the battlefield in Afghanistan by our allies, transferred into our military custody, and then transported to the United States, where a habeas petition was filed on his behalf. In support of Hamdi’s designation as an enemy combatant, the government filed the hearsay declaration of Michael Mobbs, Special Advisor to the Under Secretary of Defense for Policy, summarizing the factual basis for Hamdi’s detention. The government argued that “ ‘[r]espeet for separation of powers and the limited institutional capabilities of courts in matters of military decision-making in connection with an ongoing conflict’ ought to eliminate entirely any individual process, restricting the courts to investigating only whether legal authorization exists for the broader detention scheme,” or “[a]t most,” review “under a very deferential ‘some evidence’ standard,” which the government asserted the Mobbs Declaration met. Id. at 527, 124 S.Ct. 2633. The district court disagreed, imposing procedural safeguards and discovery burdens “approaching] the process that accompanies a criminal trial.” Id. at 528, 124 S.Ct. 2633. The plurality of the Court, however, disagreed with both positions, noting that due process and normal habeas procedures demand more than the government sought to give, but also recognized that the exigencies and burdens of military warfare may necessitate a modification of the procedures and evidentiary showings normally demanded by our habe-as jurisprudence.
As noted by the Hamdi plurality at the outset, “§ 2241 and its companion provisions provide at least a skeletal outline of the procedures to be afforded a petitioner in federal habeas review.” Id. at 525, 124 S.Ct. 2633. Once the petition is filed by or on behalf of the detainee setting forth “the facts concerning the applicant’s ... detention,” 28 U.S.C.A. § 2242, the habeas court “direct[s] the respondent to show cause why the writ should not be granted,” 28 U.S.C.A. § 2243, which places the burden upon “[t]he person to whom the writ or order is directed [to] make a return certifying the true cause of the detention,” id. Section “2243 provides that ‘the person detained may, under oath, deny any of the facts set forth in the return or allege any *263 other material facts,’ and § 2246 allows the taking of evidence in habeas proceedings by deposition, affidavit, or interrogatories.” Hamdi, 542 U.S. at 525, 124 S.Ct. 2633. However, while “Congress envisioned that habeas petitioners would have some opportunity to present and rebut facts[,] ... courts in cases like this retain some ability to vary the ways in which they do so as mandated by due process.” Id. at 526,124 S.Ct. 2633.
In determining what process would be appropriate in light of the facts at hand, the Hamdi plurality recognized the fundamental “tension that often exists between the autonomy that the [government asserts is necessary in order to pursue effectively a particular goal and the process that a citizen contends he is due before he is deprived of a constitutional right.” Id. at 528, 124 S.Ct. 2633. The individual’s interest, of course, is “the most elemental of liberty interests — the interest in being free from physical detention.” Id. at 529, 124 S.Ct. 2633. The government’s interests, however, are equally compelling — the interest “in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict,” id. at 530, 124 S.Ct. 2633, and the interest in “ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States,” id. at 531, 124 S.Ct. 2633. Arriving at the procedures necessary to ensure that a person, even an enemy combatant, is not deprived of his liberty without due process of law, the plurality noted, requires a balancing of these “serious competing interests.” Id. at 529, 124 S.Ct. 2633. To balance those competing interests, the plurality turned to the test articulated by the Court in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), which
dictates that the process due in any given instance is determined by weighing “the private interest that will be affected by the official action” against the [g]overnment’s asserted interest, “including the function involved” and the burdens the [government would face in providing greater process. The Mathews calculus then contemplates a judicious balancing of these concerns, through an analysis of “the risk of an erroneous deprivation” of the private interest if the process were reduced and the “probable value, if any, of additional or substitute procedural safeguards.”
Hamdi 542 U.S. at 529, 124 S.Ct. 2633 (internal citations omitted) (emphasis added) (quoting Mathews, 424 U.S. at 335, 96 S.Ct. 893).
Applying the Mathews test to the situation at hand, the plurality ultimately rejected both the “some evidence” standard proposed by the government and the criminal-like process suggested by the district court, ruling that:
neither the process proposed by the [gjovernment nor the process apparently envisioned by the District Court below strikes the proper constitutional balance when a United States citizen is detained in the United States as an enemy combatant. That is, “the risk of an erroneous deprivation” of a detainee’s liberty interest is unacceptably high under the [gjovernment’s proposed rule, while some of the “additional or substitute procedural safeguards” suggested by the District Court are unwarranted in light of their limited “probative value” and the burdens they may impose on the military in such cases.
Hamdi 542 U.S. at 532-33, 124 S.Ct. 2633 (quoting Mathews, 424 U.S. at 335, 96 S.Ct. 893). However, while the plurality rejected the notion that a criminal-like process was mandated, it concluded that, at a minimum, a “citizen-detainee seeking *264 to challenge his classification as an enemy-combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the [gjovernment’s factual assertions before a neutral deci-sionmaker.” Hamdi, 542 U.S. at 533, 124 S.Ct. 2633. “[T]he full protections that accompany challenges to detentions in other settings may prove unworkable and inappropriate in the enemy-combatant setting,” the plurality recognized, but “the threats to military operations posed by a basic system of independent review are not so weighty as to trump a citizen’s core rights to challenge meaningfully the [g]ov-ernment’s case and to be heard by an impartial adjudicator.” Id. at 535, 124 S.Ct. 2633 (emphasis added).[5]
Because Hamdi was a battlefield detainee captured in a foreign nation, the core of the government’s argument was that the need for lessened process was “heightened by the practical difficulties that would accompany a system of trial-like process.” Id. at 531,124 S.Ct. 2633. Specifically, the government argued that “military officers who are engaged in the serious work of waging battle would be unnecessarily and dangerously distracted by litigation half a world away, and discovery into military operations would both intrude on the sensitive secrets of national defense and result in a futile search for evidence buried under the rubble of war.” Id. at 531-32, 124 S.Ct. 2633.
As dictated by Mathews, the plurality took account of these military burdens in weighing the interests at stake, and recognized that, when balancing the competing interests, these burdens might indeed demand a lessening of the normal process due:
[T]he exigencies of the circumstances may demand that, aside from these core elements [of notice and an opportunity to be heard], enemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict. Hearsay, for example, may need to be accepted as the most reliable available evidence from the [gjovemment in such a proceeding. Likewise, the Constitution would not be offended by a presumption in favor of the [g]ovemment’s evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided. Thus, once the [gjovernment puts forth credible evidence that the ha-beas petitioner meets the enemy-combatant criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria. A burden-shifting scheme of this sort would meet the goal of ensuring that the errant tourist, embedded journalist, or local aid worker has a chance to prove military error while giving due regard to the Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant. In the words of Mathews, process of this sort would sufficiently address the “risk of an erroneous deprivation” of a detainee’s liberty interest while eliminating certain procedures that have questiona *265 ble additional value in light of the burden on the [government.
Hamdi, 542 U.S. at 533-34, 124 S.Ct. 2633 (emphasis added).[6]
In sum, Hamdi’s relaxed evidentiary standard of accepting hearsay evidence and presumption in favor of the government arose from the plurality’s recognition that the process warranted in enemy-combatant proceedings may be lessened if the practical obstacles the Executive would confront in providing the procedural protections normally due warrant such a modification.[7]
B.
With these concepts in mind, I turn to the habeas proceeding conducted by the district court in al-Marri’s case, and the question of whether the process accorded him after his motion for summary judg-tuent was denied was constitutionally sufficient.
Although the district court rejected al-Marri’s claim that as a matter of law he could not be detained as an enemy combatant, the district court properly recognized that al-Marri (like Hamdi) retained the constitutional right to challenge the allegations supporting his detention at a hearing satisfying the requirements of due process. Thus, the district court referred the case to a magistrate judge for a determination of what process al-Marri was entitled to in his efforts to challenge his designation.
During a status conference held before the magistrate judge, al-Marri sought full discovery from the government, arguing that such discovery was appropriate because many of the factors weighing against expansive discovery that were appropriate in Hamdi would not apply to him because Hamdi had been seized by military officers in a combat setting.[8] Unlike in Hamdi, al- *266 Marri argued, the discovery he sought would be primarily, if not entirely, from civilian agencies and therefore would not interfere with the war powers or operations of the government. Al-Marri , thus argued that the discovery he sought would be more akin to information obtained in a standard criminal investigation.
The magistrate judge, however, denied al-Marri’s attempts to obtain evidence under § 2246, rejected al-Marri’s attempts to distinguish Hamdi, and ruled that Ham-di’s relaxed evidentiary standard and presumption in favor of the government were equally and automatically appropriate for al-Marri’s enemy-combatant proceeding. Thus, the magistrate judge concluded that the Rapp Declaration was sufficient by itself to provide al-Marri with notice of the factual basis for his designation as an enemy combatant and to meet the government’s initial burden to set forth credible evidence that he met the enemy-combatant criteria. The magistrate judge accorded al-Marri sixty days to file factual evidence to rebut the Rapp Declaration by “more persuasive evidence.”[9] If al-Marri was “unable to produce more persuasive evidence than that produced by the government,” ie., the Rapp Declaration, “the inquiry [would] end there.” J.A. 183. But if al-Marri proved by more persuasive evidence that he was not an enemy combatant, he would not necessarily receive relief. If the government so desired, the magistrate judge would give the government another chance and proceed to a “full-blown adversary hearing” with the government having the burden to show “by clear and convincing evidence that the petitioner represents a continuing, present and grave danger to the national security of the United States and whose detention is necessary to prevent him from aiding al Qaeda in its efforts to attack the United States.” J.A. 183.
Al-Marri thereafter filed a response generally denying the government’s allegations. However, al-Marri asserted that the magistrate judge had erred in relieving the government of its constitutional and legal burden of coming forward with sufficient admissible evidence establishing that al-Marri was, in fact, an enemy combatant. Al-Marri thus “decline[d] at th[at] time the Court’s invitation to assume the burden of proving his own innocence,” which he deemed to be an “unconstitutional, unlawful and un-American” burden. J.A. 243 (internal quotation marks omitted).[10] The magistrate judge then issued a report and recommendation that the habeas petition be dismissed based upon al-Marri’s failure to rebut the Rapp Declaration. Because al-Marri “presented] nothing but a general denial to the Executive’s assertion of facts,” J.A. 243, the magistrate judge concluded, al-Marri had “refused to partici *267 pate in a meaningful way,” J.A. 244, thus “squandering] his opportunity to be heard.” J.A. 248.
Over al-Marri’s objections, the district court adopted the report and recommendation and dismissed the petition. Although recognizing the lack of any “binding standard for reviewing the factual basis supporting the detention of an alleged enemy combatant” and the “little guidance” provided by the Supreme Court in Hamdi the district court concluded that the framework discussed by the Hamdi plurality should be applied to al-Marri’s situation. Al-Marri, 443 F.Supp.2d at 778. The district court found unconvincing al-Marri’s contention that “Hamdi does not apply here because the ‘constitutional balance’ it struck is limited to cases where the alleged enemy combatant is captured on a foreign battlefield.” Id. In the district court’s view, Hamdi was “not tethered to the facts surrounding [Hamdi’s] apprehension and detention,” and “the Supreme Court intended the due process structure it announced in Hamdi to apply to any challenge to detention mounted by an alleged enemy combatant.” Id. at 779. “As Ham-di has been interpreted as supporting the authority of the President to designate Padilla and al-Marri as enemy combatants and to order their detention,” the district court noted, “it makes little sense to cast aside the framework it announced for analyzing the factual evidence supporting that detention. The Court concludes, then, that the due process requirements outlined in Hamdi apply here.” Id. at 780 (internal citations omitted). The district court therefore held that the hearsay declaration of Rapp was sufficient to satisfy the government’s initial burden of providing al-Marri notice of the factual allegations supporting his designation and that al-Marri had no right to cross-examination or discovery in making his initial response.
Turning to the adequacy of al-Marri’s response itself, the district court agreed that al-Marri had abandoned his opportunity to respond, “rendering] the [g]overnment’s assertions uncontested” and placing al-Marri “in an untenable position.” Id. at 785. Al-Marri’s “failure to offer any evidence on his behalf’ necessarily resulted in his failure “to present ‘more persuasive evidence’ to rebut” the Rapp Declaration. Id. “[U]nder Hamdi’s outline of the procedures applicable in enemy combatant proceedings,” the district court concluded that it “need go no further” and dismissed the petition. Id. According to the district court, al-Marri “received notice of the factual basis supporting his detention” and was “afforded a meaningful opportunity to rebut that evidence.” Id. I respectfully disagree.
C.
The dispute in this appeal is relatively straight-forward, although its resolution is not. Al-Marri contends that he stands in a different posture from Hamdi and that due process demands more rigorous procedural safeguards than those provided by the district court here and by the plurality in Hamdi. The government counters that the Hamdi plurality’s framework provided al-Marri all the process he was due, asserting (1) that the Hamdi framework for providing process to a citizen enemy combatant captured on a foreign battlefield is, a fortiori constitutionally sufficient for an alien enemy combatant seized in the United States; and (2) that al-Marri failed to take advantage of the process he was provided, making his claim for additional process unpersuasive.
Having carefully considered the plurality’s guidance in Hamdi and the precedents upon which it relies, I am of the opinion that the district court erred in categorically applying the framework discussed by *268 the Hamdi plurality to al-Marri’s situation and accepting the Rapp Declaration as sufficient to shift the burden of persuasion to al-Marri without considering the specific circumstances before it. As was the case in Hamdi, “the full protections that accompany challenges to detentions in other settings [might] prove unworkable and inappropriate in [al-Marri’s] enemy-combatant [proceeding].” Hamdi, 542 U.S. at 535, 124 S.Ct. 2633. But that remains to be seen because, in my opinion, the district court erred in the initial step of accepting the hearsay affidavit of Rapp “as the most reliable available evidence from the [government,” id. at 534, 124 S.Ct. 2633, without any inquiry into whether the provision of nonhearsay evidence would unduly burden the government, and erred in failing to then weigh the competing interests of the litigants in light of the factual allegations and burdens placed before it for consideration.[11]
1.
I begin with a general observation of the breadth of the ruling below. The district court concluded that the Hamdi decision was not limited to the facts surrounding Hamdi’s apprehension and that the Supreme Court intended its framework to apply to every habeas petition filed by an alleged enemy combatant. On this broad point, I have no particular quarrel. However, from this premise, the district court also ruled that the Rapp Declaration, like the Mobbs Declaration in Hamdi, was sufficient to satisfy the government’s initial step in the burden-shifting scheme, without requiring any showing by the government that the circumstances demanded that the proceedings should be “tailored to alleviate their uncommon potential to burden the Executive” or that the hearsay affidavit of Rapp was “the most reliable available evidence from the [g]overnment” because the presentation of more reliable evidence would unduly burden the government or otherwise interfere with the military or other national security efforts of the Executive. Id. at 534, 124 S.Ct. 2633.
In my opinion, the Hamdi plurality neither said nor implied that normal procedures and evidentiary demands would be lessened in every enemy-combatant habeas case, regardless of the circumstances. And I cannot endorse such a view, which would allow the government to seize and militarily detain any person (including American citizens within this country) and support such military detention solely with a hearsay declaration of a government official who has no first-hand information about the detainee — regardless of whether more reliable evidence is readily available or whether the presentation of such evidence would impose any burden upon the government or interfere at all with its war or national security efforts.[12]
*269 Although I do not rule out the possibility that hearsay evidence might ultimately prove to be the most reliable available evidence from the government in this case, Hamdi does not support such a categorical relaxation of the protections due persons who are detained within our borders. As noted earlier, the Hamdi plurality balanced the competing interest of the detainee in being free from governmental detention against the interest of the government in detaining those who pose a threat to national security and concluded that “the full protections that accompany challenges to detentions in other settings may prove unworkable and inappropriate in the enemy-combatant setting.” Id. at 535, 124 S.Ct. 2683 (emphasis added). The Hamdi plurality’s acceptance of hearsay evidence from the government in such settings, however, clearly arose from the context of a battlefield detainee, the “exigencies of [such] circumstances,” and the “uncommon potential to burden the Executive at a time of ongoing military conflict.” Id. at 533, 124 S.Ct. 2633. The relaxed evidentiary standard was accepted in the balance as appropriate in light of the facts of that case — a person initially detained abroad by our allies on a battlefield in Afghanistan. The plurality rejected an outright disapproval of such hearsay declarations, and described lesser procedures it believed might be sufficient to satisfy the due process rights of such detainees, noting that the normal evidentiary requirements might need to be relaxed to account for the governmental interest in military matters. See id. at 533-34, 124 S.Ct. 2633 (explaining that hearsay “may need to be accepted as the most reliable available evidence from the [g]overnment” and “a presumption in favor of the [g]overnment’s evidence” would not “offend[ ]” the Constitution in battlefield detainee proceedings). But while the plurality refused to categorically prohibit hearsay declarations, neither did it categorically approve the use of such hearsay declarations in all enemy-combatant proceedings.[13] Hearsay declarations may be accepted upon a weighing of the burdens in time of warfare of “providing greater process” against the detainee’s liberty interests. Id. at 529, 124 S.Ct. 2633. But to decide whether a hearsay declaration is acceptable, the court must first take into account “the risk of erroneous deprivation” of the detainee’s liberty interest, “the probable value, if any, of any additional or substitute procedural safeguards,” and the availability of additional or substitute evidence which might serve the interests of both litigants. Id. (internal quotation marks omitted).
In sum, I disagree that the plurality in Hamdi endorsed a categorical acceptance of such hearsay declarations for all alleged *270 enemy combatants regardless of the place of seizure or the other circumstances at hand. In my view, the balancing test set forth in Mathews, and discussed in the context of enemy-combatant proceedings in Hamdi, presumes that the process due a detainee, including enemy combatants, will indeed vary with the facts surrounding the detention and the precise governmental burdens that would result from providing the normal procedures due under our constitution. See Mathews, 424 U.S. at 334, 96 S.Ct. 893 (“[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. Due process is flexible and calls for such procedural protections as the particular situation demands” (internal quotation marks and alteration omitted)); Hamdi, 542 U.S. at 526, 124 S.Ct. 2633 (noting that courts in habeas cases “retain some ability to vary the ways in which” enemy combatants may present and rebut facts “as mandated by due process”). This balancing will require flexibility on the part of the habeas court in order to deal with the wide variety of situations involved in each individual case and is a necessary component of the Ham-di framework. Thus, on remand, the locus of al-Marri’s seizure will not forbid his classification as an enemy combatant subject to military detention or foreclose the district court from lessening the normal procedures where appropriate in the balance of the competing interests, but it is not irrelevant to the task of weighing the interests at stake and balancing the risks involved to determine what due process protections are due him in his quest to challenge his designation and continued detention by our military. ' See Mathews, 424 U.S. at 334, 96 S.Ct. 893 (“[Resolution of the issue of whether [the] procedures provided ... are constitutionally sufficient requires analysis of the governmental and private interests that are affected.”).[14]
2.
In this case al-Marri’s “private interest affected by the official action” is the same as that of Hamdi, ie., the liberty interest in being free from unlawful seizure and detention. Hamdi, 542 U.S. at 529, 124 S.Ct. 2633 (internal quotation marks and ellipsis omitted). The risk of an erroneous deprivation of al-Marri’s liberty interest, however, is not identical to the risk that was present in Hamdi. Al-Marri was not captured on the battlefields of Afghanistan or Iraq, nor even apprehended in a neighboring country where al Qaeda trains its soldiers. He was arrested by civilian federal authorities while residing in Illinois. I am acutely aware of the dangers of detention and imprisonment without compliance with criminal process safeguards, dangers that are even greater when the military detains persons inside the borders of the United States. In my view, the risk of erroneously detaining a civilian or citi *271 zen in this country as an enemy combatant is much greater inside the United States than in the very different context addressed by the Supreme Court in Hamdi, i.e., a conventional battlefield within the borders of a foreign country in which we are fighting our enemies.
On the other hand, we must consider the government’s interest “in detaining those who actually pose an immediate threat to the national security of the United States during ongoing international conflict,” Hamdi, 542 U.S. at 530, 124 S.Ct. 2633, and in “ensuring that those who have in fact fought with the enemy during a war do not return to battle against the United States,” id. at 531, 124 S.Ct. 2633, as well as “the burdens the [g]overnment would face in providing greater process,” id. at 529,124 S.Ct. 2633.
Here, the government asserts that the Rapp Declaration, which summarizes the intelligence gathered on al-Marri’s activities as an al Qaeda operative, is sufficient to meet its initial burden of proving that al-Marri was properly designated an enemy combatant. However, unlike in Ham-di, the government has presented only the Rapp Declaration. It has made no attempt to show that this hearsay evidence “need[s] to be accepted as the most reliable available evidence from the [gjovernment,” id. at 533-34, 124 S.Ct. 2633, or that additional protections to ensure that the innocent are not detained by our military would be “unworkable and inappropriate in th[is] enemy-combatant setting,” id. at 535, 124 S.Ct. 2633. Nor has there been any consideration of the “probable value, if any, of additional or substitute procedural safeguards” or the availability of more reliable evidence that might be presented by substitute methods which account for the government’s weighty interests. Id. at 529, 124 S.Ct. 2633 (internal quotation marks omitted).
As previously noted, al-Marri argued below that he believed the discovery sought would be primarily from civilian agencies that could produce it without interfering with the war powers and war operations of this government.[15] At a minimum, I believe the government should be required to demonstrate to the district court why this is not the case and why, in balancing the liberty interest of the detainee and the heightened risk of erroneous deprivation, the Rapp Declaration should be accepted as the most reliable available evidence the government can produce without undue burden or serious jeopardy to either its war efforts or its efforts to ensure the national security of this nation.
3.
In this context, the Constitution prohibits subjecting an individual inside the United States to military detention unless he fits within the legal category of an enemy combatant in the armed conflict against al Qaeda or its supporting nations. If the allegations contained within the Rapp Declaration are true, then al-Marri fits within the exception and can be properly designated an enemy combatant and militarily detained pursuant to the authority granted *272 the President in the AUMF. He would be properly classified as an enemy combatant who infiltrated our country under false pretenses for the purpose of waging war via terrorist activities.
Because al-Marri was seized and detained in this country, however, he is entitled to habeas review by a civilian judicial court and to the due process protections granted by our Constitution, interpreted and applied in the context of the facts, interests, and burdens at hand. To determine what constitutional process al-Marri is due, the court must weigh the competing interests, and the burden-shifting scheme and relaxed evidentiary standards discussed in Hamdi serve as important guides in this endeavor. Hamdi does not, however, provide a cookie-cutter procedure appropriate for every alleged enemy-combatant, regardless of the circumstances of the alleged combatant’s seizure or the actual burdens the government might face in defending the habeas petition in the normal way.
Al-Marri clearly stands in a much different position from Hamdi. He was not captured bearing arms on the battlefield of Afghanistan, but was arrested within the United States by the FBI as a result of the 9/11 investigation and subsequent intelligence operations conducted by our government. This does not preclude his designation as an enemy combatant, but we cannot ignore that the evidence supporting his designation is not likely buried under the rubble of a foreign battlefield — although it might be equally unavailable for national security reasons. Thus, unlike in Hamdi, the government’s interest “in reducing the process available to alleged enemy combatants” may not be “heightened by the practical difficulties that would accompany a system of trial-like process.” Id. at 531, 124 S.Ct. 2633 (emphasis added). In sum, the government has not demonstrated that al-Marri’s fair opportunity for rebuttal requires no more than that which would have been accorded to Hamdi on remand.
Al-Marri, like any person accused of being an enemy combatant, is entitled to a fair, meaningful opportunity to contest that designation by requiring the government to demonstrate through “the most reliable available evidence” that he is an enemy combatant, denying the allegations against him, and presenting evidence in support of his contest. Id. at 534 124 S.Ct. 2633. As in Hamdi, the evidence which will be accepted and the determination of the manner in which due process proceedings must occur will again be left largely to the district courts. See id. at 538-39, 124 S.Ct. 2633 (noting that “[w]e anticipate that a District Court [will] proceed with the caution that we have indicated is necessary in this setting, engaging in a fact-finding process that is both prudent and incremental. We have no reason to doubt that courts faced with these sensitive matters will pay proper heed both to the matters of national security that might arise in an individual case and to the constitutional limitations safeguarding essential liberties that remain vibrant even in times of security concerns”); accord Boumediene, 128 S.Ct. at 2276 (“We make no attempt to anticipate all of the evidentiary and access-to-counsel issues that will arise during the course of the detainees’ habeas corpus proceedings. We recognize, however, that the Government has a legitimate interest in protecting sources and methods of intelligence gathering; and we expect that the District Court will use its discretion to accommodate this interest to the greatest extent possible.... These and ... other remaining questions are within the expertise and competence of the District Court to address in the first instance.”). In this regard, the district court retains all its normal flexibility to vary the manner in which the presentation of evidence occurs *273 in enemy-combatant proceedings. It is not precluded from accepting the hearsay declaration should it conclude that threats to national security or the war efforts dictate its use. See Hamdi, 542 U.S. at 533-34, 124 S.Ct. 2633; see also Boumediene, 128 S.Ct. at 2276 (Habeas corpus courts may not “disregard the dangers the detention in these cases was intended to prevent.... Certain accommodations can be made to reduce the burden habeas corpus proceedings will place on the military without im-permissibly diluting the protections of the writ”). But, it is not handcuffed by an inflexible procedure that would demand acceptance of a hearsay declaration from the government simply because the government has labeled al-Marri an enemy combatant.
The general rule, therefore, is that al-Marri would be entitled to the normal due process protections available to all within this country, including an opportunity to confront and question witnesses against him. But, if the government can demonstrate to the satisfaction of the district court that this is impractical, outweighed by national security interests, or otherwise unduly burdensome because of the nature of the capture and the potential burdens imposed on the government to produce non-hearsay evidence and accede to discovery requests, then alternatives should be considered and employed. Given the grave national security concerns in matters such as this, and that the Rapp Declaration references not only al-Marri’s activities in this country but also those he engaged in abroad prior to his entry here, the Rapp Declaration might conceivably prove to be “the most reliable available evidence” within the meaning of Hamdi, at least as to some allegations. However, I am not satisfied to let matters stand as they are when the government has not even been required to demonstrate to the district court why it cannot or should not be required to produce, even for ex parte examination, any of the supporting evidence relied upon by Rapp to justify al-Marri’s detention. Here, the government has made no showing that “[hjearsay ... [needs] to be accepted as the most reliable available evidence from the [gjovernment” or that the “exigencies of the circumstances ... demand ... [that the] enemy-combatant proeeeding[ ] ... be [otherwise] tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict.” Ham-di, 542 U.S. at 533-34, 124 S.Ct. 2633; cf Boumediene, 128 S.Ct. at 2275 (“Practical considerations and exigent circumstances inform the definition and reach of the law’s writs, including habeas corpus. The cases and our tradition reflect this precept.”).[16]
*274 I think due process, at a minimum, demands that the government make this showing. It is only after that showing has been made, la, “once the [g]overnment puts for credible evidence that the habeas petitioner meets the enemy-combatant criteria,” that “the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the criteria.” Id. at 534, 124 S.Ct. 2633 (emphasis added). “In the words of Mathews, process of this sort would sufficiently address the ‘risk of an erroneous deprivation’ of a detainee’s liberty interest while eliminating certain procedures that have questionable additional value in light of the burden on the [government.” Id.
D.
Concluding that the procedural framework employed below has not been shown to be constitutionally sufficient, however, does not completely end the inquiry. The district court held that the Hamdi framework, with its relaxed evidentiary standards and presumption in favor of the government, applies to every enemy-combatant case, permitting the government to meet its initial burden with a hearsay declaration regardless of the location of capture or the citizenship of the detainee. The district court also held that the Rapp Declaration was sufficient to meet the government’s initial burden, entitling it to the favorable presumption and shifting to al-Marri the burden of refuting the allegations by “more persuasive” evidence. However, al-Marri’s petition was not ultimately dismissed because the district court weighed competing factual evidence and determined that it supported a finding that al-Marri was an enemy combatant, i.e., that the allegations of the Rapp Declaration were true. Rather, the district court dismissed the petition because al-Marri failed to come forward with affidavits and documents of his own as required by the court’s order, thereby ostensibly failing to contradict the government’s position “with more persuasive evidence.”
Al-Marri, however, did not ignore the district court. He filed a pleading in which he denied the allegations in the Rapp declaration, he denied that he was an enemy combatant, and he denied he had entered the United States to commit hostile acts. In this, his first opportunity to contest his designation as an enemy combatant, he had been completely denied any discovery, not been allowed to see the evidence upon which the allegations were based, and not told even the identity of his accusers, all without adequate explanation or justification. Given that his burden was not just to contest, but to disprove, he was placed at a substantial disadvantage. And despite the efforts that have been made to slough off or ignore the burden of proof placed upon him, the fact warrants emphasis that al-Marri was required under these circumstances to prove that he was not an enemy combatant by more persuasive evidence. See J.A. 183 (holding that al-Marri would be given sixty days to file factual evidence to rebut the Rapp Declaration by “more persuasive evidence, but if ‘unable to produce more persuasive evidence than that produced by the government,’ ie., the Rapp Declaration, ‘the inquiry [would] end there’ ”). He did contest the constitutionality of the process to which he had been subjected, and he declined for the time being “to assume the burden of proving his innocence.” J.A. 231. Had he produced evidence, it is possible that the district court might have found his contrary evi *275 dence sufficiently “more persuasive” than the Rapp Declaration, but proving he was not the enemy would have gotten al-Marri exactly nothing as a practical matter since the government had been guaranteed the option of further proceedings against him.
In the end, the district court rejected al-Marri’s petition because it presumed that the process it utilized was a constitutional one, the point on which I disagree. I am aware of no case in which a person detained in this country has been stripped of the opportunity to contest the legality of his detention for refusing to participate in an unconstitutional process. Nor has any been pointed out to me. A criminal defendant cannot claim a procedural due process violation after he has refused to avail himself of protections that comport with his constitutional rights, but al-Marri is not presently a criminal defendant and he refused to participate in a process that, in my judgment, was not constitutional.
In any event, given the unique and uncertain circumstances in which al-Marri found himself as he progressed in his challenge, I think it would be unfair to punish al-Marri by dismissing his petition on this basis. Al-Marri had been charged criminally with serious crimes prior to his designation as an enemy combatant. After his transfer from civilian to military custody, he advanced a novel but plausible argument that, as a resident seized within this country, he should be considered a civilian who could not be detained as an enemy combatant and he should be returned to the criminal justice system. Were he ultimately successful on this issue, al-Marri would be accorded the presumption of innocence and the Fifth Amendment right not to “be compelled ... to be a witness against himself.” U.S. Const. Amend. V. Al-Marri simultaneously advanced a second, plausible argument that the Hamdi framework would not meet the minimum procedural due process requirements in his quite different situation, and that he was entitled to something more akin to the criminal process protections. As evidenced in Hamdi, Padilla, and this case, the government frequently changes the manner in which it deals with alleged enemy combatants during the pendency of habeas proceedings, including transferring detainees back and forth from civilian to military detention when it deems it prudent. Accordingly, al-Marri had every reason to fear that were he to give evidence on his behalf in an attempt to meet the “more persuasive” standard, the government might then choose to transfer him back to civilian custody and use his own evidence against him.
Given the serious nature of the claims before us and the uncertainties which existed at the time, and the fact that al-Marri was deprived of any opportunity to obtain any direct or first-hand evidence from those who had arrested him and later detained him, I cannot be overly critical of al-Marri’s strategy of not responding to the Rapp Declaration with rebuttal evidence beyond his general denial, and I cannot sanction dismissal of al-Marri’s habeas petition based upon a choice not to participate in the constitutionally and statutorily insufficient procedure.[17] Al-Marri may have squandered an opportunity to contest his designation, but he did not squander a “meaningful opportunity” to do so.
IV. Conclusion
To conclude, the issues we decide today are significant for the reasons stated *276 throughout all of the opinions. But, in my judgment, there are additional concerns implicated by our decision that may have gone without sufficient notice. The case before us deals on the surface with a foreign national who has entered the United States. But the rights al-Marri asserts are those available under our Constitution to anyone within our borders, including, obviously, American citizens. Under the current state of our precedents, it is likely that the constitutional rights our court determines exist, or do not exist, for al-Marri will apply equally to our own citizens under like circumstances. This means simply that protections we declare to be unavailable under the Constitution to al-Marri might likewise be unavailable to American citizens, and those rights which protect him will protect us as well.
The Hamdi court gave the government the opportunity to use hearsay testimony when practical considerations required it, and the court suggested that this evidence might also be accompanied by a presumption of validity. See id. at 534, 124 S.Ct. 2633. Because the detainee must prove a negative — that he is not an enemy combatant — to obtain release and he or someone on his behalf must do it with more persuasive evidence in circumstances where the military may be holding the detainee incommunicado, simple fairness seems to me to require that first-hand evidence from the government should be the norm and the use of hearsay the exception. Add to the mix that the individual could be an American citizen and that the government’s evidence could be here in the United States, easily accessible and publicly disclosable, and the need for a check on the government’s use of a hearsay affidavit to justify the long-term military detention of a person becomes obvious.
In these uncertain times, we must tread carefully when balancing our need for national security with our rights as individuals. This case is fraught with danger to individual rights and for that reason, I expressly limit the reach of my opinion and decide no more than is explicit and necessary to address the issues presented to us.
If the allegations against al-Marri are true, al-Marri is a foreign national and member of al Qaeda who entered the United States with a purpose to commit additional hostile and war-like acts within our homeland, and he may therefore be detained as an enemy combatant under the AUMF. Accordingly, I would affirm the district court’s order denying al-Marri’s motion for summary judgment on the issue of whether the President possesses the legal authority to detain al-Marri as an enemy combatant.
However, because al-Marri was present within our borders at the time our intelligence sources identified him as an enemy combatant, he is entitled to contest his designation under the burden-shifting scheme outlined in Hamdi. Under this scheme, the government may demonstrate that the balance of the competing interests weighs on the side of lessened due process protections, which al-Marri and his counsel may contest. But because the district court applied Hamdi’s lessened procedures to al-Marri without any additional inquiry or balancing of the respective interests, I would hold that the process al-Marri received was constitutionally insufficient, vacate the district court’s order dismissing al-Marri’s petition, and remand for further proceedings.

. The offenses consisted of one count of possession of 15 or more unauthorized or counterfeit credit card numbers, with intent to defraud, in violation of 18 U.S.C.A. § 1029(a)(3) (West 2000); two counts of making a false statement to the FBI, in violation of 18 U.S.C.A. § 1001(a)(2) (West 2000 & Supp.2007); three counts of making a false statement in a bank application, in violation of 18 U.S.C.A. § 1014 (West Supp.2007); and one count of using a means of identification of another person for the purpose of influencing the action of a federally insured financial institution, in violation of 18 U.S.C.A. § 1028(a)(7) (West Supp.2007). Al-Marri was initially charged with these offenses in two indictments in the Southern District of New York, but the indictments were dismissed on venue grounds. Al-Marri was then returned to Peoria and re-indicted on the same seven counts in the district court of Illinois.

. Although the district court denied al-Marri's motion for a stay to prevent his transfer prior to filing a habeas petition, the government agreed to inform counsel of al-Marri’s location and to provide the court and counsel with advance notice of any plan to move al-Marri outside the United States.

. Al-Marri's petition initially set forth two additional claims, asserting that he was denied the right to counsel and unlawfully interrogated. When his petition was filed, al-Marri claimed that he was being held incommunicado at the Naval Brig, without access to his counsel, and that he had been provided no opportunity to contest his designation as an enemy combatant. He was subsequently granted access to counsel in October 2004. The district court ruled that al-Marri's claims for deprivation of his right to counsel and unlawful interrogation were not cognizable in the habeas action. Al-Marri is currently pursuing these claims in a separate action, Al-Marri v. Rumsfeld, C.A. No. 2:05-cv-02259-HFFRSC (filed Aug. 8, 2005), which is still pending before the district court. See Al-Marri v. Wright, 443 F.Supp.2d 774, 777 n. 2 (D.S.C.2006).

. Shortly after our ruling in Padilla, the government filed a motion for authorization to transfer Padilla from military custody to civilian custody and suggested that we withdraw our prior opinion. We denied the motion and suggestion, noting “that the transfer of Padilla and the withdrawal of our opinion at the government’s request while the Supreme Court is reviewing this court’s decision ... would compound what is, in the absence of explanation, at least an appearance that the government may be attempting to avoid consideration of our decision by the Supreme Court, and also because we believe that this case presents an issue of such especial national importance as to warrant final consideration by that court, even if only by denial of further review.” Padilla v. Hanft, 432 F.3d 582, 583 (4th Cir.2005). We, therefore, expressed the view that any decision to terminate the litigation “should be made not by this court but, rather, by the Supreme Court.” Id. at 584. The Supreme Court subsequently granted the government’s motion to transfer. See Hanft v. Padilla, 546 U.S. 1084, 126 S.Ct. 978, 163 L.Ed.2d 721 (2006).

. In a partially concurring opinion, Justice Souter and Justice Ginsberg joined with the plurality in ordering remand to "allow Hamdi to offer evidence that he is not an enemy combatant." Hamdi, 542 U.S. at 553, 124 S.Ct. 2633 (Souter, concurring in part). Although they declined to adopt the plurality’s precise resolution of the due process issue, ble concurring justices indicated that they would not "disagree with the plurality’s determinations (given the plurality's view of the [AUMF]) that someone in Hamdi’s position is entitled at a minimum to notice of the [g]ov-ernment’s claimed factual basis for holding him, and to a fair chance to rebut it before a neutral decisionmaker.” Id.

. In August 2004, following the Supreme Court's June decision in Hamdi, we remanded the case to the Eastern District of Virginia for further proceedings consistent with the Supreme Court's decision. By October 2004, the parties had settled the matter. Hamdi was transported to Saudi Arabia, released from United States custody, and his petition dismissed with prejudice as settled, with no further consideration of the issue of what process was due Hamdi on remand.

. The Supreme Court’s recent decision in Boumediene v. Bush,-U.S.-, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), I believe, confirms this approach to the question of whether and how the normal process due may be lessened in enemy-combatant proceedings. There, the Court reiterated the "uncontroversial” principles that "the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation’ of relevant law” and that "the habeas court must have the power to order the conditional release of an individual unlawfully detained.” Id. at 2266. But, the Court went on to recognize that these are only "the easily identified attributes of any constitutionally adequate habeas corpus proceeding.... [Dlepending on the circumstances, more may be required.” Id. As noted by the Court, "common-law habeas corpus was, above all, an adaptable remedy. Its precise application and scope changed depending upon the circumstances.” Id. (emphasis added); see also id. at 2283 (Roberts, C.J., dissenting) ("Because the central purpose of ha-beas corpus is to test the legality of executive detention, the writ requires most fundamentally an Article III court able to hear the prisoner's claims and, when necessary, order release. Beyond that, the process a given prisoner is entitled to receive depends on the circumstances and the rights of the prisoner.” (citation omitted) (emphasis added)).

.Specifically, al-Marri sought all statements made by al-Marri; all documents relied upon by Rapp or describing the sources of information referenced in the Rapp Declaration; all documents upon which the government intended to rely; all documents upon which the CIA, Department of Justice, Department of Defense, and the President relied in determining whether al-Marri was an enemy combatant; all documents describing the standard *266 for the designation; and any exculpatory evidence. The request, therefore, included all documents pertaining to interrogations and interviews conducted by United States officials or others acting on their behalf. In addition, al-Marri sought to depose the sources referenced in or relied upon by Rapp in his declaration, including the high-level officials in the Executive Branch.

. The Hamdi framework requires the individual to meet the government’s evidence with proof that is “more persuasive,” and this is what the magistrate judge explicitly required of al-Marri. Thus, there is no basis for the argument that al-Marri needed only to come forward with "some evidence” to contradict the Rapp Declaration.

. Al-Marri also complained that large portions of the Rapp Declaration deemed classified were not shared with him or his counsel, severely hampering his ability to refute the allegations against him. After the district court advised the parties that it would not consider information not presented to al-Mar-ri, the government filed an updated, declassified version of the Rapp Declaration.

. I find no guidance from Padilla on this particular question. Like Hamdi, Padilla "associated with forces hostile to the United States in Afghanistan and took up arms against the United States forces in that country in our war against al Qaeda.” Padilla, 423 F.3d at 388. And like al-Marri, Padilla was then "recruited, trained, funded, and equipped by al Qaeda leaders to continue prosecution of the war in the United States” through additional terrorist activities here, but was apprehended in this country before he could complete his mission. Id. Although we held in Padilla that the place of capture did not affect the President's power to detain Padilla, neither this court nor the Supreme Court has held that the place of capture does not affect the minimum constitutional process due.

. Once such evidence (which might also enjoy a favorable presumption) is presented, the burden will shift to the detainee to rebut the showing with evidence that is "more persuasive” than that of the government. See Ham-di, 542 U.S. at 534, 124 S.Ct. 2633. A detainee's general denial of the hearsay allegations will be insufficient. Rather, he will be re *269 quired to refute the fact-specific allegations made against him by presenting "more persuasive evidence that he falls outside the criteria.” Id.

. Thus, I do not believe Hamdi recognized that the government’s burden in enemy-combatant proceedings could always be satisfied by a knowledgeable affiant who summarizes the evidence on which the detention was based. That is not what Hamdi said at all. Instead, the plurality merely noted that, in the context of the case before it, the Government had made it clear "that documentation regarding battlefield detainees already is kept in the ordinary court of military affairs” and that "[a]ny factfinding imposition created by requiring a knowledgeable affiant to summarize these records to an independent tribunal is a minimal one.” Hamdi, 542 U.S. at 534, 124 S.Ct. 2633 (emphasis added). For this reason, the Hamdi plurality was unpersuaded by the government’s claim that "this basic process [would] have [a] dire impact on the central functions of warmaking.” Id. I cannot read this language divorced from the context in which it was written and would demand no more than the same benefits/burdens analysis given to Hamdi.

. Thus, the locus of capture is not an artificial or categorical distinction, nor is it the lynchpin of my view. I have made it clear that I do not rule out the possibility that the Rapp Declaration might be acceptable, although al-Marri is entitled to have the basis for such acceptance explained to an Article III court before he is deprived of his liberty interest in being free from physical detention. Actually, I propose that al-Marri receive exactly what the Hamdi plurality gave to Ham-di — a directive that the district court weigh his rights against the actual governmental burdens to determine whether a lessening of the normal procedures is warranted. For the reasons discussed by the Hamdi plurality, the locus of capture affects the question of whether we should accept less reliable evidence, such as a hearsay affidavit, than we normally would in habeas cases. But this is because capture in a war zone almost certainly will increase the burden placed upon the Executive by requiring production of direct or firsthand evidence supporting the designation. It is not simply because the detainee was abroad when seized.

. For example, it seems that at least some portions of the Rapp Declaration merely summarize interviews of al-Marri conducted by FBI agents after his civilian arrest and by DOD personnel once he was transferred to military custody and imprisoned in the Charleston Naval Brig. There is every indication that these governmental agents have firsthand information about the basis for al-Mar-ri's detention and, unlike the military personnel at issue in Hamdi, are present in the United States. The government has made no showing that it would be unduly burdensome to the war effort or, more particularly, to its efforts to carry out the directives of the AUMF, to have them appear, either in person or by their own firsthand affidavits, before the district court.

. The Boumediene Court held that the procedural protections given to enemy combatants under the Military Commissions Act of 2006, Pub.L. No. 109-366, 120 Stat. 2600, fell "well short of the procedures and adversarial mechanisms that would eliminate the need for ha-beas corpus review,” id., 128 S.Ct. at 2260, noting in particular that while “[t]he detainee is allowed to present 'reasonably available' evidence, ... his ability to rebut the Government's evidence against him [which is accorded a presumption of validity] is limited by the circumstances of his confinement and his lack of counsel at th[at] stage,” id., 128 S.Ct. at 2260 (citation omitted). And while the dissent disagreed that the CSRT hearings were an insufficient substitute for habeas, it too pointed out in defense that the CSRT provides “every petitioner ... the right to present evidence that he has been wrongfully detained,” “including] the right to call witnesses who are reasonably available, question witnesses called by the tribunal, introduce documentary evidence, and testify before the tribunal.” Id., 128 S.Ct. at 2287 (Roberts, C.J., dissenting). Nowhere, in either Hamdi or Boume-diene, do I find support for the view that a detainee may be wholly deprived of all discovery and all rights to cross-examination and confrontation — regardless of the availability *274 of the witnesses and documentary evidence— without any inquiry into whether exigent circumstances or other concerns for national security necessitate such a drastic lessening of the process normally available who challenge their executive detention.

. See 28 U.S.C.A. § 2246 (“On application for a writ of habeas corpus, evidence may be taken orally or by deposition, or, in the discretion of the judge, by affidavit. If affidavits are admitted any party shall have the right to propound written interrogatories to the affi-ants, or to file answering affidavits.”) (emphasis added).